## Oyer and Terminer—New York County.

*July*, 1886.

## PEOPLE *v.* KOSTKA.

### CONSPIRACY — PEN. CODE, § 168, SUBD. 5 — "BOYCOTTING."

Where a number of men combine together to injure, and thereby to prevent the exercise of a lawful calling, by congregating near the doors of the person to be injured, by printing circulars descriptive of the supposed grievances, and by distributing the same near and about his doors to the customers and passers-by, and the effect of such overt acts is to intimidate and thereby warn off his customers and the general public who might .otherwise patronize him, and to intimidate such person himself, those who so conspire and participate in the overt acts, are guilty of the crime of conspiracy under section 168, subdivision 5, Penal Code.

The jury may consider, upon the question of intimidation, the fact that the distribution of these circulars was not an isolated act, but was repeated three days in succession, each day with an increased number of distributors, amounting to fifteen on the last day.

The jury may also consider the character of these circulars and the language used in them, and may see whether they contain appeals to passion, or are otherwise i'' 'nmatory in their character.

They may also take into a\ )nt testimony, that on the night before the commencement of the o\_.ert acts, the accused parties went to the complainant's place of business, where a dispute took place and threats were made and acts of violence committed by the accused; and the jury may consider the distribution of the circulars in the light of what then and there occurred.

The mere fact that no violence was used in the street is not conclusive; nor is it necessary that there should have been a direct threat.

If the jury believe that the attitude actually presented by the distributors of the circulars was one of intimidation, either to the passers-by or to the complainant (the proprietor of the business), considering all the circumstances, then all who participated, directly or indirectly, are within the meaning of the word "intimidation," as used in the conspiracy act.

TRIAL of an indictment for conspiracy, under subdivision 5, section 168, Penal Code.

The defendants, Paul Kostka and sixteen others, were indicted April 10, 1886, in the Court of General Sessions of New York, under the above statute, and also under section 653, subdivision 3, Penal Code, and said indictment was thereafter transferred to the Oyer and Terminer for trial. A demurrer was interposed on the ground that the facts stated did not constitute a crime, which demurrer was overruled and the defendants pleaded not guilty, and were tried before Justice BARRETT and a jury, July 8, 1886, and six of the defendants were convicted under the first count of the indictment, and one, viz., Inatz Zenzik, found not guilty. The other defendants were discharged for lack of proof of identity.

The indictment was as follows: "The grand jury of the city and county of New York, by this indictment, accuse Paul Kostka and sixteen others of the crime of conspiracy committed as follows: The said defendants, all late of the city and county of New York aforesaid, being evil disposed persons, together with divers other evil disposed persons whose names are to the grand jury aforesaid unknown, unlawfully, wickedly and maliciously desiring and intending, by force, threats and intimidation, to prevent and hinder one Josephine Landgraff from using and exercising her lawful trade and calling as a baker, which she then and there used, exercised and carried on in a certain house and bakery, there situate, having and employing in the carrying on of her said lawful trade and calling divers journeymen and workmen in the said trade and calling, on the fourteenth day of April, in the year of our Lord eighteen hundred and eighty-six, at the city and county aforesaid, unlawfully, wickedly and maliciously did conspire, combine, confederate and agree together, between and amongst themselves, by force, threats and intimidation, to prevent and hinder the said Josephine Landgraff from using and exercising her said lawful trade and calling. And the said defendants, together with the said other evil disposed persons, in pursuance and furtherance of, and according to the said conspiracy, combination, confederacy and agreement between and amongst t. selves, as aforesaid, afterwards, to wit, on the day and in the year aforesaid, at the city and

county aforesaid, did unlawfully, wickedly and maliciously threaten the said Josephine Landgraff to cut off and utterly exclude her from all intercourse and dealings, in the way of buying and selling, and to shun her at all times and in all places, and to subject her to annoyance, injury and loss in the pursuit of her said lawful trade and calling, and to hold her up to public hatred and contempt. And the said defendants, together with the said other evil-disposed persons, in the further pursuance and furtherance of and according to the said conspiracy, combination and agreement between and amongst themselves, as aforesaid, afterwards, to wit, on the day and in the year aforesaid, at the city and county aforesaid, unlawfully, wickedly and maliciously, by watching and besetting the said house and bakery of the said Josephine Landgraff, and by divers threats, threatening notices, placards, handbills and printed circulars, and also by solicitations, falsehoods and persuasions, did attempt and endeavor to intimidate divers persons whose names are to the grand jury aforesaid unknown, being then desirous of trading with and doing business with the said Josephine Landgraff, and to prevent and deter the said persons from so trading and doing business with her. And the said defendants, together with the said other evil-disposed persons, in the further pursuance and furtherance of and according to said conspiracy, combination, confederacy and agreement between and amongst themselves, as aforesaid, afterwards, to wit, on the day and in the year aforesaid, at the city and county aforesaid, unlawfully, wickedly and maliciously, by so watching and besetting the said home and bakery of said Josephine Landgraff, and by the threats, threatening notices, placards, handbills and printed circulars, aforesaid and by so attempting and endeavoring to intimidate the said persons being so desirous of trading and doing business with the said Josephine Landgraff, and to prevent and deter them from so doing; and also, by divers other threats, and by intimidation, and other subtle and indirect means, and by divers devices and strategies and unjust and oppressive acts, did greatly harass, annoy, impede, embarrass and obstruct the said Josephine Landgraff in the use and exercise of her said

lawful trade and calling, to wit, for the better carrying the said conspiracy, combination, confederacy and agreement into effect and execution, against the form of the statute in such case made and provided, and against the peace of the people of the State of New York and their dignity.

*Second Count.* And the grand jury aforesaid, by this indictment, further accuse the said Paul Kostka, and sixteen others, of the crime of coercion, committed as follows: The said defendants, all late of the city and county aforesaid, afterwards, to wit, on the day and in the year aforesaid, at the city and county aforesaid, with a view to compel the said Josephine Landgraff to abstain from exercising her lawful trade and calling, which she so, as aforesaid, then and there used and exercised, and had a legal right to use and exercise at her own free will and pleasure, with force and arms, did unlawfully and wrongfully attempt the intimidation of her, the said Josephine Landgraff, by threats, against the form of the statute in such case made and provided, and against the peace of the people of the State of New York and their dignity.

*Randolph B. Martine,* district attorney, *John R. Fellows* and *Ambrose H. Purdy* (assistants), for the people, plaintiff.

*Moses Hermann* and *John W. Goff,* for the defendants.

The charge of the trial judge was as follows:

"BARRETT, J.—Gentlemen of the jury, this case in itself, if we did not look at the great underlying principles involved, might seem to be a very trumpery affair. We are here in the heat of summer, listening to the contentions of people who do not speak our language, with regard to a labor disturbance in a small bakery in this city.

"The interests involved are of course more or less serious to these people, although insignificant when looked at in the light of the great interests which are daily passing before us. But there is, as I suggested, a wide-reaching question here; and the case, though petty upon the surface, is essentially a great one because of the greatness of the principle involved. The question

of the right to do what was done here is to be determined by you under the instructions which I will give you. Upon the issue of this case will depend substantially the settlement of the question whether the condition of things which has been laid before you shall or shall not continue; for I apprehend that if it shall be deliberately determined that the acts of these defendants were unlawful, such acts will cease. While there may and probably will be some feeling of irritation on the part of those who have resorted to these methods, there will then unquestionably be acquiescence, voluntary we hope and believe, but by the strong arm of the law if counsels less wise should prevail.

"Now, gentlemen, the question here is one of conspiracy, and the charge is that a conspiracy was formed to prevent a woman from exercising her lawful calling or trade of a baker. We have had some difficulty in getting at the origin of the trouble, and indeed we cannot be quite certain that we have penetrated that seeming mystery. Some witnesses tell us that it originated in a refusal of Mrs. Landgraff to pay as high wages as she should have paid, and others tell us that it originated in the discovery in her employ of some proscribed person, vulgarly described as a 'scab.' Quite what this latter word means in the 'argot' of these people we have been unable to ascertain from any of them. Indeed there seems to be either an inability or a disinclination on the part of the witnesses to take the law into their confidence with regard to the sources of the difficulty. However, we are to deal with the consequences of the trouble. Whatever the cause may have been, if these people did what they had a legal right to do, then we have no fault to find with them in a court of justice. They may have done unmanly things, things that seem unworthy of American citizenship and foreign to American methods, but they are not on trial for violations of good taste or of the proprieties of civilized life. They are here face to face with the question of criminality, and of that alone. Did they or did they not commit a crime? That is the sole question. We must keep ourselves carefully to that. We have no right to punish any one merely because his behavior is not such as we approve of. On

the other hand, we must not fail to condemn the defendants if they have transgressed against the criminal law, even if the end sought to be obtained was a good one. Men are never justified, even for a good end, in resorting to unlawful means. The law says that workingmen may co-operate or combine for the purpose of obtaining an increase of their wages, but they have no right to combine for the purpose of preventing other people from working who are willing to accept less wages. You see at once, that if that doctrine prevailed, we would be face to face with a species of slave labor. The workingman would be enslaved by the very forces organized and set in motion for his protection. If there is one thing in this country which the people have ever insisted upon, it is free labor, and I sincerely trust that they may not have to add to the old war cries of free speech, free press and free men, the new war cry of free labor. It is to be hoped that this may never be necessary, and that the good sense of the laboring man may teach him that labor should be free and not bond. Laboring men have a right, as I have said before, to combine and co-operate for the purpose of increasing their wages, of improving their condition, and of elevating their social status. So far as they do that, they have our best wishes and our warmest sympathy; but the moment they go beyond that and seek to put their ban upon others who take a different view of what is an adequate rate of wages, they forfeit sympathy and take the position of a tyrant; and when they go still further and seek by violence to prevent their brethren from working, and to punish them for this independence, they become transgressors against the law.

"The question here, then, of special importance is, whether these defendants have by their acts rendered themselves amenable to the conspiracy law. As I said before, they may co-operate to improve their condition and to increase their wages, they may refuse to work for less than the price they have jointly fixed, and they may do everything that is lawful and peaceable to secure that price. They may even go to their brethren and beseech them not to work for less than the fixed rate. They may use all fair arguments to prevent acceptance of less than

the agreed standard of wages. All this they may lawfully do. Argument, reasoning and entreaty are lawful weapons. But the moment they go beyond these means and threaten to punish him whom they believe to be their erring brother. threaten him with violence should he stand in the way of their success by accepting a lower rate than that fixed by the co-operators, they bring themselves face to face with the law. Up to that point of threat or violence they may do what they please, and public opinion says 'Heaven speed you.' But at that point they must stop.

"Now, in the present case, did these defendants overstep the just and lawful line? Did they, no matter what their end, whether good or bad, seek to prevent this woman, Landgraff, from exercising her lawful trade or calling by intimidation? Let us see precisely what they did. We have evidence that on the night which preceded the first distribution of circulars, some eighteen men (three at least of the accused being among them) went to her bakery and a dispute of some kind ensued. There is testimony to the effect that one of the eighteen threatened to kill one of her bakers; also to the effect that some of the eighteen spat in the faces of some of her bakers and committed other acts of violence. It is fair to say that there is also some testimony on the part of the defense contradicting this testimony and denying these acts. It is for you (who are the sole judges of the facts), to say whether you believe the testimony of the witnesses who tell us that threats were made and violent acts committed. If you believe this testimony and credit the commission of acts of violence, then we come to what took place the next morning, namely, the distribution of the circulars which have been read in evidence before you. You may consider, upon this question of intimidation, the fact that the distribution of these circulars was not an isolated act, but was repeated three days in succession, each day with an increased staff of distributors, until upon the last day the number had increased to fifteen persons. You may also consider the character of these circulars and the language used in them. You will notice that they commence quite gently, invoking the moral support of their fellow-citizens. In later paragraphs,

however, they speak of having been subjected to violence and insult. You may look through these circulars and see whether they contain appeals to passion or are otherwise inflammatory in their character. You may also consider the distribution in the light of what occurred the night before. You will remember that one of the witnesses testified that Linhard said, the night before the distribution of circulars, to the baker whose life was threatened, that if he, that baker, would come outside, he would in substance feel the weight of his, Linhard's, displeasure. Suppose that baker had come outside when these circulars were being distributed, what would have happened? Do you feel, upon the whole, that if that baker had come outside, during the distribution of circulars, he would have been molested? The mere fact that no violence was actually used in the street is not conclusive. It is for you to say whether the attitude of these men was threatening. Nor is it necessary that there should have been a direct threat. If you believe that the attitude actually presented by the distributors of those circulars was an attitude of intimidation, either to the passers-by, or to the woman inside (Mrs. Landgraff), considering all the circumstances, then all who participated in it, directly or indirectly, are within the meaning of that word intimidation, as used in the conspiracy act.

"I need not say to you that if that be the truth of the case, these people cannot escape because they may not have succeeded in punishing Mrs. Landgraff to the extent which they hoped. It is the conspiracy to prevent the exercise of a lawful calling by means of intimidation, with overt acts of an unlawful character, which constitute the crime, and although a thousand citizens might come forward, and because of their indignation against the attack upon the woman, enrich her out of their own personal funds, the wrong-doers cannot avail themselves of this kindness, or right feeling, or charity, as a shield against the consequences of criminal acts. Has, then, a conspiracy to injure this woman's business, to prevent the exercise of a lawful calling by means of intimidation been established to your satisfaction? If it has, then the question remains, can a number of men so combine to so injure and to

so prevent the exercise of a lawful calling, not by personal solicitation in a general way, but by congregating in numbers near the doors of the person to be injured, by printing circulars descriptive of the supposed grievances in more or less emphatic language, and by distributing such circulars near and about his doors to his customers and to passers-by? If the conspiracy here be established and the effect of the overt acts was to intimidate and by such intimidation to warn off Mrs. Landgraff's customers and the general public which might otherwise patronize her and to intimidate her, then such of the defendants as so conspired and participated in the overt acts are guilty.

"If, on the whole, you think that there is not such a case made out beyond a reasonable doubt, it will be your duty to acquit. If, on the other hand, you feel satisfied that such a case has been made out, it will be your duty to convict.

"You should not be influenced by public opinion in reference to this matter, nor by sympathy for this woman as a woman, nor by sorrow for her misfortune. Nor are you to be swayed by passion or prejudice. I am asked to so charge you, and I do so. That is all true, perfectly true. On the other hand, I will not insult you by the suggestion that if you feel it to be your duty to convict, you are not to be deterred from doing that duty by any fear of ulterior consequences."

Mr. GOFF—"I ask your honor to charge the jury that they are not to be affected in any way by a meeting held last night; and further, that they can, if they think proper, acquit any number, one or all, or convict any number, one or all."

The COURT—"Of course they will not be affected by the meeting to which you refer. I will give you, gentlemen, the names of the accused defendants, and you may find a verdict that they are all guilty, or all innocent, or that one or more is guilty, or one or more innocent."

"As to Ignatz Zenzik, I confess that looking at the case in its length and breadth I do not feel that his participation in the actual distribution of these circulars is proved beyond that reasonable doubt which the law requires. With that sug-

gestion, I will leave the case to you, simply adding that if you decide to acquit him, it will meet the approval of the Court."

Mr. GOFF—"I ask your honor to add to that portion of your charge in which you say it is difficult to get at the cause of the difficulty, that there is a cause alleged in the circular."

The COURT—"I so charge."

Mr. GOFF—"I would further request your Honor to charge that the jury may take into consideration the manner in which the circulars were given out by the defendants."

The COURT—"I so charge."

Mr. GOFF—"I ask your Honor to charge the following propositions:

"*First.* The fact that Mrs. Landgraff, the complainant, is a widow does not affect the question of the guilt or innocence of the defendants. It is of no concern to them whether she be a widow or not."

The COURT—"I so charge."

"*Second.* Public clamor or excitement in the newspapers or elsewhere on the subject of boycotting must in no way affect or sway your minds in arriving at your verdict. The defendants are entitled to a fair trial upon the facts alone as they have been proven before you, no matter what the state of public opinion may be."

The COURT—"I so charge."

"*Third.* Nor must you be in any way affected or swayed in your judgment by the fact that other persons called 'boycotters' have been convicted in this Court. This case must be tried alone on its merits without reference to how other trials resulted."

The COURT—"I so charge."

"*Fourth.* Before you can find the defendants guilty, you must find that when they entered into this combination to boycott Mrs. Landgraff they had and were actuated by a criminal intent."

The COURT—"I so charge."

"*Fifth.* The mere fact that proof has been offered that the defendants agreed to do an act prohibited by statute, followed by overt acts in furtherance of the agreed purpose, does not

conclusively establish that the defendants are guilty of the crime of conspiracy. If you find that there was no criminal intention you must acquit."

The COURT—"I so charge, as, however, criminal intention is defined by law."

"*Sixth.* Even though you may be satisfied that a conspiracy was entered into, yet, before the defendants can be convicted, it must be proven to your satisfaction that overt acts were committed which were in themselves criminal, and which were contemplated by the conspirators and committed in pursuance thereof."

The COURT—"I so charge."

"*Seventh.* If the defendants agreed to an act innocent in itself in good faith and without the use of criminal means, they are not converted into conspirators because it turns out that the contemplated act was prohibited by statute."

The COURT—"That is not applicable to the present case."

Mr. GOFF—"I except."

"*Eighth.* The mere fact that the defendants entered into an agreement to withhold their custom from Mrs. Landgraff and to solicit others to withhold theirs, and that in the carrying out of that agreement they did not make use of illegal means or methods, they are not guilty of conspiracy and should be acquitted."

The COURT—"I so charge."

"*Ninth.* Even though you find that the object of the agreement or confederation of the defendants was to adopt measures having a tendency to diminish the gains and profits of Mrs. Landgraff, that of itself is not unlawful unless the means adopted to carry out the measures were unlawful."

The COURT—"I so charge."

"*Tenth.* If the defendants assembled or co-operated in an orderly and peaceful manner for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such a rate in their trade or calling, the defendants are not guilty of a conspiracy."

The COURT—"I so charge."

"*Eleventh.* Under this indictment you are at liberty to find a verdict of not guilty as to all the defendants or any of them."

The COURT—"I so charge."

"*Twelfth.* If the defendants demanded an increase of wages, or assembled and used all lawful means to induce employers to pay such wages, and fair compensation for services rendered, then there was no conspiracy, and the defendants are entitled to be acquitted."

The COURT—"I so charge.

"*Thirteenth.* The defendants are all presumed to be innocent until the contrary is proven."

The COURT—"I so charge."

"*Fourteenth.* If you have any reasonable doubt upon the whole evidence that the guilt of the defendants has not been satisfactorily proven, they are entitled to an acquittal."'

The COURT—"I so charge."

Mr. GOFF—"I except to that portion of your honor's charge in which you say that on the issue of this case will depend the question whether the condition of things as testified to shall continue."

The COURT—"That was not stated as a proposition of law, but as an illustrative suggestion with regard to the importance of the case."

Mr. GOFF—"I also except to that part of your honor's charge down to the words 'are these acts amenable to the criminal law?' Also to that portion of your honor's charge in which you state that the jury may consider whether the tendency of the circular, or what it contained, was inflammatory or likely to create passion."

The remarks of the court in passing sentence were as follows:

The COURT—(To the prisoners, each sentence being translated into Bohemian). "Your case differs very materially from that of the so-called Theiss boycotters who were here tried last week. They were men of better education than you, and they extorted a large amount of money in a most unrelenting and abominable manner. You did nothing of that kind, but ignorantly distributed offensive circulars, in a manner calculated to intimidate. This was undoubtedly illegal, but as this

is the first case of the kind, the court will deal leniently with you. As many good people did not know that such a distribution of circulars was wrong, you might well have been mistaken about it. This case has now settled the question that the distribution of these circulars in the manner and under the circumstances here disclosed, is a crime. Hereafter no one can plead ignorance of the law, for having had a fair trial, an impartial jury and a court anxious to protect all your rights, it has been decided that your acts were criminal.

"We would not have you believe that the law is your enemy. On the contrary, we want you feel that it is your truest and best friend. The jury recommend you to mercy, and that mercy you shall have. I trust that our clemency will sink into the hearts of those like you who have similarly erred, and that in future we shall hear no more of this kind of boycotting. You must not find fault with the law because you receive some punishment for your offense. The law is like a fire. A fire warms you in winter when you are cold, but if you put your hand into it you will be burned. Now, in view of the recommendation to mercy made by the jury, and consulting also my own feelings (this being the first case of this kind, and the law being now settled), I have determined that the punishment should be slight.

"To those of you who simply distributed the circulars in the street, without having gone previously to Mrs. Landgraff's place or threatened her, the judgment of the court is that you be imprisoned in the city prison for ten days; that applies to Kellenik, Mayor and Budelofsky.

"To the three of you who went to Mrs. Landgraff's place the night before the distribution and made a disturbance, I must mete out a somewhat greater punishment, for your guilt is greater. But, even here, there is a difference. Linhard is the worst, because he threatened to take the life of a man, and so he will receive the greatest punishment. In the cases of Oprava and Zerrisck, the judgment of the court is that they be imprisoned in the city prison for the period of thirty days. In

the case of Linhard the judgment is that he be imprisoned in the penitentiary for the period of thirty days.

"Having thus exercised the amplest clemency I desire to say that if hereafter any similar cases are brought before me, I mean cases where the law has been again disregarded notwithstanding the rules laid down upon this trial, and especially the condemnation of boycotting by the distribution of circulars evidenced by this verdict, I shall deem it to be my duty to punish the offender, be he man or woman, rich or poor, to the full extent of the law."