## TRUAX ET AL., COPARTNERS, DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF WILLIAM TRUAX, *v.* CORRIGAN ET AL.

### ERROR TO THE SUPREME COURT OF THE STATE OF ARIZONA.

No. 13. Argued April 29, 30, 1920; restored to docket for reargument June 6, 1921; reargued October 5, 6, 1921.—Decided December 19, 1921.

1. Where the issue is whether a state statute, in its application to facts specifically alleged, and admitted by demurrer, violates the plaintiff's rights under the Constitution, this court must analyze the facts as averred and draw its own inferences as to their ultimate effect; it is not bound by the state court's conclusion in this regard, nor by that court's declaration that the statute is merely a rule of evidence.   P. 324.

2. The bill showed in substance that the defendants, for the purpose of winning a strike called by the defendant labor union over terms and conditions of employment in plaintiffs' restaurant, conspired to injure or destroy the business by inducing actual and prospective customers to withhold their patronage, and to that end caused the restaurant to be picketed by men who, throughout business hours, were stationed at the entrance proclaiming in a loud voice its "unfairness" to union labor, and who patrolled the sidewalk before it and, by word of mouth and through banners and handbills, made and circulated abusive and libelous attacks upon the plaintiffs, their business, their employees and customers, with threats of like consequences to future customers; and that much injury to the business resulted. *Held,* that the bill stated a plain case of conspiracy and actionable wrong.   P. 327.

3. If, as it seems to have been interpreted by the Supreme Court of Arizona, the law of that State (Rev. Stats., 1913, par. 1464) regulating injunctions in labor controversies, grants the defendants in this case immunity from any civil or criminal action for the wrongs above stated, or leaves them merely subject to criminal prosecution for libel, it violates the Fourteenth Amendment by depriving the plaintiffs of their property without due process of law.   P. 328.

4. The legislative power of a State can only be exerted in subordination to the fundamental principles of right and justice which

the guaranty of due process in the Fourteenth Amendment is intended to preserve, and a purely arbitrary or capricious exercise of that power, whereby a wrongful and highly injurious invasion of property rights is practically sanctioned and the owner stripped of all real remedy, is wholly at variance with those principles. P. 329. *New York Central R. R. Co.* v. *White,* 243 U. S. 188, distinguished.

5. The distinction between peaceful secondary boycotts and the present case, considered. P. 330.

6. The relations of the due process and equal protection clauses of the Fourteenth Amendment, considered. P. 331.

7. The equal protection clause was aimed at undue favor and individual or class privilege, on the one hand, and at hostile discrimination or the oppression of inequality on the other; it secures equality of protection not only for all, but against all, similarly situated; it is a pledge of the protection of equal laws. P. 332.

8. Assuming that a state legislature may vary equitable relief in the state courts at its discretion, and even take away their equity jurisdiction altogether, the equality clause forbids that it deny such relief to one man while granting it to another under like circumstances and in the same territorial jurisdiction. P. 334.

9. A state law which specially exempts ex-employees, when committing tortious and irreparable injury to the business of their former employer, from restraint by injunction, while leaving subject to such restraint all other tort-feasors engaged in like wrong-doing, is unreasonable and without any just relation to the acts in respect of which it is proposed. P. 337.

10. Such a classification cannot be upheld as a legalized experiment in sociology; the very purpose of the Constitution was to prevent experimentation with the fundamental rights of the individual. P. 338. *Second Employers' Liability Cases,* 223 U. S. 1; *New York Central R. R. Co.* v. *White, supra,* and similar cases, distinguished.

11. In view of the construction placed by the state court upon Ariz. Rev. Stats., 1913, par. 1464, in this case, and because the equal protection clause applies only to state action, the conclusion that the statute is in part unconstitutional does not mean that § 20 of the Clayton Act, an act of Congress similarly worded but very differently construed, is also invalid. P. 340. Cf. *American Steel Foundries* v. *Tri-City Central Trades Council, ante,* 184.

12. Paragraph 1456, Ariz. Rev. Stats., 1913, making general provision for issuance of injunctions, is separable from par. 1464, *supra,* having been adopted by the Territory and continued by

the state constitution as a state law before par. 1464 was enacted as an amendment, and the unconstitutionality of the latter does not affect the continued operation of the former. P. 341. *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, distinguished.

20 Ariz. 7, reversed.

ERROR to review a decree of the Supreme Court of Arizona, which affirmed a decree of the Superior Court of Cochise County dismissing upon demurrer the complaint of the present plaintiffs in error in their suit to restrain the defendants from committing the acts described in the opinion.

*Mr. Clifton Mathews,* with whom *Mr. Everett E. Ellinwood* and *Mr. John Mason Ross* were on the briefs, for plaintiffs in error.

The acts and conduct of defendants constitute a secondary boycott. *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, and many other cases.

This very fact of picketing is in itself sufficient to show the coercive character of the means employed. *Atchison, Topeka & Santa Fe Ry. Co.* v. *Gee,* 139 Fed. 582; *Vonnegut Machinery Co.* v. *Toledo Machine Co.,* 263 Fed. 192; *Local Union No. 313* v. *Stathakis,* 135 Ark. 86; *Pierce* v. *Stablemen's Union,* 156 Cal. 70; *Rosenberg* v. *Retail Clerks' Association,* 39 Cal. App. 67; *Barnes & Co.* v. *Chicago Typographical Union,* 232 Ill. 424; *Sherry* v. *Perkins,* 147 Mass. 212; *Beck* v. *Railway Teamsters' Protective Union,* 118 Mich. 497; *Webb* v. *Cooks' &c. Union,* 205 S. W. 465; *St. Germain* v. *Bakery & Confectionery Workers' Union,* 97 Wash. 282.

The word " unfair," when used under the circumstances set forth in the complaint, is, in effect, a notification to the public that the place or person declared " unfair " is being boycotted by organized labor, and that anyone who continues dealing with the boycotted person will thereby incur the enmity of labor organizations generally, and will be likely to suffer some form of retaliation at their

hands. *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *Seattle Brewing Co.* v. *Hansen,* 144 Fed. 1011. See also *American Federation of Labor* v. *Buck's Stove & Range Co.,* 33 App. D. C. 83; *Wilson* v. *Hey,* 232 Ill. 389.

The printed handbills are scurrilous and abusive and convey a threat of injury to plaintiffs' customers. The vagueness of the threat only renders it the more effective. *Casey* v. *Cincinnati Typographical Union,* 45 Fed. 135; *Seattle Brewing Co.* v. *Hansen,* 144 Fed. 1011; *Rocky Mountain Bell Telephone Co.* v. *Montana Federation of Labor,* 156 Fed. 809; *My Maryland Lodge* v. *Adt,* 100 Md. 238; *Beck* v. *Railway Teamsters' Union,* 118 Mich. 497.

But for the statute in question, the boycott could have been enjoined. The courts of this country, both state and federal, are practically unanimous in holding that a secondary boycott, as here exemplified, is wrongful and unlawful. [Citing many authorities.]

The writ of injunction has not been abolished in Arizona, but, on the contrary, it has been expressly recognized and provided for by statute. Rev. Stats. Arizona, 1913, par. 1456. The issuance of injunctions under this statute is a matter of daily occurrence. The only requirement is that the applicant must show himself entitled thereto under the principles of equity.

In depriving plaintiffs of the right to enjoin the boycott while leaving the remedy by injunction still available to other litigants, the statute denies plaintiffs the equal protection of the laws, contrary to the Fourteenth Amendment. As construed by the Arizona Supreme Court, it discriminates against plaintiffs, (1) by reason of the class to which they belong, and (2) by reason of the class to which their property belongs.

By these classifications, a remedy freely granted to one person is withheld from another, though they both

stand in the same situation. The right sought to be protected, the wrong sought to be prevented, the remedy sought to be applied, the propriety of the remedy, the urgency of the need, the form of the action, the pleadings, the proofs—all the facts and all the equities—may be the same in the one case as in the other; and yet the remedy which the court grants to the one applicant must be withheld from the other, simply because of the accidental and wholly irrelevant circumstance that this applicant once employed the wrong-doers, and had a disagreement with them concerning the terms and conditions of their employment and that the wrong is being committed because of that disagreement; coupled with the further accidental and irrelevant fact that the property which the applicant seeks to protect is not of a tangible character, but consists merely of his business and of his right to conduct that business in such lawful manner as he sees fit.

Is not this as arbitrary and capricious, as unreasonable and oppressive, as if the statute had said that injunctions should be granted to white men and withheld from colored men, or granted to Protestants and withheld from Catholics, or granted to Democrats and withheld from Republicans? Might it not as well have said that injunctions should issue to protect real estate, but not personal property, or to protect brick houses, but not wooden houses, or to protect houses situated on even-numbered lots, but not those on odd-numbered lots? Can it be said that the distinction upon which the classification is based bears any reasonable or just relation to the thing in respect to which the classification is imposed?

Thanks to the good sense and fair-mindedness of legislatures generally, attempts to deny this right of equal access to the courts have been comparatively few and infrequent. Examples, however, have not been wanting. *Connolly v. Union Sewer Pipe Co.*, 184 U. S. 540; *John-*

son v. *Goodyear Mining Co.,* 127 Cal. 4; *Black* v. *Seal,* 6 Houst. 541; *Hecker* v. *Illinois Central R. R. Co.,* 231 Ill. 574; *Green* v. *Red Cross Medical Service Co.,* 232 Ill. 616; *Zolnowski* v. *Illinois Steel Co.,* 233 Ill. 299; *Reinhardt* v. *Chicago Junction Ry. Co.,* 235 Ill. 576; *Funkhouser* v. *Randolph,* 287 Ill. 94; *Cincinnati &c. Ry. Co.* v. *Clark,* 11 Ky. Law Rep. 286; *German Insurance Co.* v. *Miller,* 12 Ky. Law Rep. 138; *Pearson* v. *Portland,* 69 Me. 278; *Opinion of Justices,* 211 Mass. 618; *Bogni* v. *Perotti,* 224 Mass. 152; *In re Flukes,* 157 Mo. 125; *McClung* v. *Pulitzer Publishing Co.,* 279 Mo. 370; *Hargraves Mills* v. *Harden,* 56 N. Y. S. 937; *Rosin* v. *Lidgerwood Mfg. Co.,* 86 N. Y. S. 49; *Wally's Heirs* v. *Kennedy,* 2 Yerg. 554; *Phipps* v. *Wisconsin Central Ry. Co.,* 133 Wis. 153; *Kiley* v. *Chicago &c. Ry. Co.,* 138 Wis. 215; *State* v. *Wisconsin-Minnesota Light Co.,* 165 Wis. 430. Of all these cases, the one which most nearly resembles the case at bar is that of *Bogni* v. *Perotti.*

*Mr. Jackson H. Ralston,* with whom *Mr. Stanley D. Willis, Mr. Wiley E. Jones* and *Mr. Samuel Herrick* were on the briefs, for defendants in error.[1]

The issue presented is, whether peaceable persuasion by circulars, banners and word of mouth is intrinsically unlawful, and by its very existence unlawfully takes away some property or property rights of plaintiffs.

While the question has been largely discussed in picketing cases, yet, analyzing this situation, the picketing is purely incidental—a means adopted to inform the public that plaintiffs' establishment was deemed unfair. This picketing can not be regarded in any other light, because no state or municipal law has been violated, and the ingress and egress of customers has not been interfered with.

---

[1] At the first hearing the case was argued by *Mr. Ralston* and *Mr. Herrick,* for defendants in error.

We deny that the plaintiffs possess any such absolute good will as against the defendants that it may be called property. Good will, which is property, is something which ordinarily arises out of contract. Wherever it is said to be infringed, and no contract relations have been shown to exist, such statement is made because some law has been violated, upon the observance of which the complaining party had a right to rely; or some public nuisance exists from which the plaintiff has suffered special damages. The thing which the courts protect in such cases is not good will in any usual sense of the term, but a man's fair right to obtain a livelihood.

In the present instance, there is no contract relation of good will; there is no right to appeal to a court of equity except it be that by some means considered by the law improper under all the circumstances the defendants have injured or destroyed plaintiffs' opportunity to gain a livelihood. This they have not done by the violation of any law, by the creation of any nuisance or in any manner save one—communication to the public of the fact that plaintiffs' establishment is "unfair" to organized labor. This statement, as appears from the bill, is an entirely truthful one, and the defendants had an interest in making it known to the public. Hence, the work of the union did not constitute a gratuitous attempt to interfere with the plaintiffs' business.

We admit that, even though these objects are generally recognized as sufficient to justify such action on the part of unions, yet, if coupled with wantonness or disorder, or creating a public nuisance, which especially affects the employer, he may appeal to a court of equity. But in the absence of wantonness or libel, which are not charged here, the defendants have an absolute right of free speech, which extends, likewise, to freedom of publication. Such rights are more sacred than are rights to conduct business.

·The provision of the Arizona statute under considera-
tion strongly resembles § 20 of the Clayton Act. Though
§§ 6 and 20 of the Clayton Act have been before the
federal courts on many occasions, it has never been sug-
gested that that act was unconstitutional or deprived
anyone of property or of a property right. See on this
point, and also on the general proposition regarding
picketing: *Alaska S. S. Co. v. International Longshore-
men's Association,* 236 Fed. 964; *Tri-City Central Trades
Council v. American Steel Foundries,* 238 Fed. 728
[s. c., *ante,* 184]; *Stephens v. Ohio State Telephone Co.,*
240 Fed. 759; *Puget Sound Traction Co. v. Whitley,* 243
Fed. 945; *Kroger Grocery Co. v. Retail Clerks' Associa-
tion,* 250 Fed. 890; *Duplex Printing Press Co. v. Deering,*
247 Fed. 192; 252 Fed. 722; *Kinloch Telephone Co. v.
Local Union No. 2,* 265 Fed. 312. In neither *Hitchman
Coal & Coke Co. v. Mitchell,* 245 U. S. 229, nor *Paine
Lumber Co. v. Neal,* 244 U. S. 459, was there any sugges-
tion that the labor provisions of the Clayton Act were
invalid.

Peaceful picketing such as has ·been indulged in by
the defendants has many times been declared entirely
lawful. [Citing many cases.]

From a consideration of these cases, it is clear that
in no single instance has any court, state or federal,
declared such legislation as the Arizona statute and the
Clayton Act to be unconstitutional. On the contrary,
they have recognized the right of the legislature to do
away with proceedings by injunction, leaving to the law
court determination of the question of the infliction of
real and unlawful damage.

The plaintiffs seek to confuse peaceful picketing with
the general subject of boycotting, with which it has but
an incidental relation. Their argument for the most
part begs the real question in the case,—the character,
lawful or unlawful, of the defendants' action. The cases

relied on by plaintiffs are inapplicable here. The unlawful means referred to in nearly all of them are threats of personal damage leveled at the person addressed, violence, coercion and intimidation, none of which elements is set out in the bill in this case.

The Arizona statute does not hold in favor of any particular class, or against any other particular class, but makes a provision as to " any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment." A broader classification could hardly be conceived, as nearly the entire human race can be grouped under the words " employers and employees." *Goldberg, Bowen & Co.* v. *Stablemen's Union,* 149 Cal. 429; *Opinion of the Justices,* 211 Mass. 618; and *Bogni* v. *Perotti,* 224 Mass. 152, are distinguishable.

The right of the State to make classifications is a very broad one and is to be interfered with only upon a clear showing that it resulted in denying the equal protection of the laws. *Singer Sewing Machine Co.* v. *Brickell,* 233 U. S. 304; *International Harvester Co.* v. *Missouri,* 234 U. S. 199. Certainly the discrimination alleged in the present case is no greater than that in the laws held by this court to be not unconstitutional in the two last cited cases.

MR. CHIEF JUSTICE TAFT delivered the opinion of the court.

The plaintiffs in error, who were plaintiffs below, and will be so called, own, maintain and operate, on Main Street, in the City of Bisbee, Arizona, a restaurant, known as the " English Kitchen." The defendants are cooks and waiters formerly in the employ of the plaintiffs, together with the labor union and the trades assembly of which

they were members.   All parties are residents of the State of Arizona.

The complaint set out the following case:

In April, 1916, a dispute arose between the plaintiffs and the defendants' union concerning the terms and conditions of employment of the members of the union.   The plaintiffs refused to yield to the terms of the union, which thereupon ordered a strike of those of its members who were in plaintiffs' employ.   To win the strike and to coerce and compel the plaintiffs to comply with the demands of the union, the defendants and others unknown to the plaintiffs entered into a conspiracy and boycott to injure plaintiffs in their restaurant and restaurant business, by inducing plaintiffs' customers and others theretofore well and favorably disposed, to cease to patronize or trade with the plaintiffs.   The method of inducing was set out at length and included picketing, displaying banners, advertising the strike, denouncing plaintiffs as " unfair " to the union and appealing to customers to stay away from the " English Kitchen," and the circulation of handbills containing abusive and libelous charges against plaintiffs, their employees and their patrons, and intimations of injury to future patrons.   Copies of the handbills were set forth in exhibits made part of the complaint.

In consequence of defendants' acts, many customers were induced to cease from patronizing plaintiffs, and their daily receipts, which had been in excess of the sum of $156 were reduced to $75.   The complaint averred that if the acts were continued, the business would be entirely destroyed, and that the plaintiffs would suffer great and irreparable injury; that for the plaintiffs to seek to recover damages would involve a multiplicity of suits; that all the defendants were insolvent, and would be unable to respond in damages for any injury resulting from their acts and the plaintiffs were therefore without any adequate remedy at law.

The complaint further averred that the defendants were relying for immunity on Paragraph 1464 of the Revised Statutes of Arizona, 1913, which is in part as follows:

" No restraining order or injunction shall be granted by any court of this state, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving or growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property or to a property right of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at or near a house or place where any person resides or works, or carries on business, or happens to be for the purpose of peacefully obtaining or communicating information, or of peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute; or from recommending, advising, or persuading others by peaceful means so to do; . . ."

The plaintiffs alleged that this paragraph if it made lawful defendants' acts contravened the Fourteenth Amendment to the Constitution of the United States by depriving plaintiffs of their property without due process of law, and by denying to plaintiffs the equal protection of the laws, and was, therefore, void and of no effect. Upon the case thus stated the plaintiffs asked a temporary, and a permanent, injunction.

The defendants filed a demurrer, on two grounds: First, that the complaint did not state facts sufficient to constitute a cause of action, in that the property rights asserted therein were not, under Paragraph 1464, Revised Statutes of Arizona, 1913, of such character that their irreparable injury might be enjoined, and secondly, that upon its face the complaint showed a want of equity.

The Superior Court for Cochise County sustained the demurrer and dismissed the complaint, and this judgment was affirmed by the Supreme Court of Arizona.

The ruling of the Supreme Court proceeded first on the assumption that the gravamen of the complaint was that the defendants were merely inducing patrons to cease their patronage by making public the fact of the dispute and the attitude of plaintiffs in it, and, secondly, on the proposition that, while good will is a valuable factor in business success, "no man . . . has a vested property right in the esteem of the public," that, while the plaintiff had a clear right to refuse the demand of the union, the union had a right to advertise the cause of the strike. The court held that the purpose of Paragraph 1464 was to recognize the right of workmen on a strike to use peaceable means to accomplish the lawful ends for which the strike was called; that picketing, if peaceably carried on for a lawful purpose, was no violation of the rights of the person whose place of business was picketed; that, prior to the enactment of Paragraph 1464, picketing was unlawful in Arizona because it was presumed to induce breaches of the peace, but that plaintiffs had no vested right to have such a rule of law continue in that State; that under Paragraph 1464 picketing was no longer conclusively presumed to be unlawful; that the paragraph simply dealt with a rule of evidence requiring the courts to substitute evidence of the nature of the act for the presumption otherwise arising; that the plaintiffs' property rights were not invaded by picketing unless the

picketing interfered with the free conduct of the business; that plaintiffs did not claim that defendants had by violent means invaded their rights, and that if that kind of picketing were charged and established by proof plaintiffs would be entitled to relief to the extent of prohibiting violence in any form.

The effect of this ruling is that, under the statute, loss may be inflicted upon the plaintiffs' property and business by " picketing " in any form if violence be not used, and that, because no violence was shown or claimed, the campaign carried on, as described in the complaint and exhibits, did not unlawfully invade complainants' rights.

The facts alleged are admitted by the demurrer, and in determining their legal effect as a deprivation of plaintiffs' legal rights under the Fourteenth Amendment, we are at as full liberty to consider them as was the State Supreme Court. *Mackay* v. *Dillon,* 4 How. 421; *Dower* v. *Richards,* 151 U. S. 658, 667. Nor does the court's declaration that the statute is a rule of evidence bind us in such an investigation. *Bailey* v. *Alabama,* 219 U. S. 219, 238, 239; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minnesota,* 134 U. S. 418; *Mugler* v. *Kansas,* 123 U. S. 623, 661; *Corn Products Refining Co.* v. *Eddy,* 249 U. S. 427, 432. In cases brought to this court from state courts for review, on the ground that a federal right set up in the state court has been wrongly denied, and in which the state court has put its decision on a finding that the asserted federal right has no basis in point of fact or has been waived or lost, this court as an incident of its power to determine whether a federal right has been wrongly denied, may go behind the finding to see whether it is without substantial support. If the rule were otherwise, it almost always would be within the power of a state court practically to prevent a review here. *Kansas City Southern Ry. Co.* v. *Albers Commission Co.,* 223 U. S. 573, 591, 593; *Cedar Rapids Gas Light Co.* v. *Cedar Rapids,* 223 U. S. 655, 668,

312.                    Opinion of the Court.

669; *Southern Pacific Co.* v. *Schuyler,* 227 U. S. 601, 611.
Another class of cases in which this court will review the
finding of the court as to the facts is when the conclusion
of law and findings of fact are so intermingled as to make
it necessary, in order to pass upon the question to analyze
the facts. *Northern Pacific Ry. Co.* v. *North Dakota,* 236
U. S. 585, 593; *Jones National Bank* v. *Yates,* 240 U. S.
541, 552, 553. In view of these decisions and the grounds
upon which they proceed, it is clear that in a case like the
present, where the issue is whether a state statute in its
application to facts which are set out in detail in the
pleadings and are admitted by demurrer, violates the Fed-
eral Constitution, this court must analyze the facts as
averred and draw its own inferences as to their ultimate
effect, and is not bound by the conclusion of the State
Supreme Court in this regard. The only respect in such a
case in which this court is bound by the judgment of the
State Supreme Court is in the construction which that
court puts upon the statute.

The complaint and its exhibits make this case:

The defendants conspired to injure and destroy plain-
tiffs' business by inducing their theretofore willing patrons
and would-be patrons not to patronize them and they
influenced these to withdraw or withhold their patronage:

(1) By having the agents of the union walk forward
and back constantly during all the business hours in front
of plaintiffs' restaurant and within five feet thereof, dis-
playing a banner announcing in large letters that the
restaurant was unfair to cooks and waiters and their
union.

(2) By having agents attend at or near the entrance of
the restaurant during all business hours and continuously
announce in a loud voice, audible for a great distance, that
the restaurant was unfair to the labor union.

(3) By characterizing the employees of the plaintiffs as
scab Mexican labor, and using opprobrious epithets con-

cerning them in handbills continuously distributed in front of the restaurant to would-be customers.

(4) By applying in such handbills abusive epithets to Truax, the senior member of plaintiffs' firm, and making libelous charges against him, to the effect that he was tyrannical with his help, and chased them down the street with a butcher knife, that he broke his contract and repudiated his pledged word; that he had made attempts to force cooks and waiters to return to work by attacks on men and women; that a friend of Truax assaulted a woman and pleaded guilty; that plaintiff was known by his friends, and that Truax's treatment of his employees was explained by his friend's assault; that he was a "bad actor."

(5) By seeking to disparage plaintiffs' restaurant, charging that the prices were higher and the food worse than in any other restaurant, and that assaults and slugging were a regular part of the bill of fare, with police indifferent.

(6) By attacking the character of those who did patronize, saying that their mental calibre and moral fibre fell far below the American average, and enquiring of the would-be patrons—Can you patronize such a place and look the world in the face?

(7) By threats of similar injury to the would-be patrons—by such expressions as "All ye who enter here leave all hope behind." "Don't be a traitor to humanity"; by offering a reward for any of the ex-members of the union caught eating in the restaurant; by saying in the handbills: "We are also aware that handbills and banners in front of a business house on the main street give the town a bad name, but they are permanent institutions until William Truax agrees to the eight-hour day."

(8) By warning any person wishing to purchase the business from the Truax firm that a donation would be necessary, amount to be fixed by the District Trades As-

sembly, before the picketing and boycotting would be given up.

The result of this campaign was to reduce the business of the plaintiffs from more than $55,000 a year to one of $12,000.

Plaintiffs' business is a property right (*Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 465) and free access for employees, owner and customers to his place of business is incident to such right. Intentional injury caused to either right or both by a conspiracy is a tort. Concert of action is a conspiracy if its object is unlawful or if the means used are unlawful. *Pettibone* v. *United States,* 148 U. S. 197, 203; *Duplex Printing Press Co.* v. *Deering, supra.* Intention to inflict the loss and the actual loss caused are clear. The real question here is, were the means used illegal? The above recital of what the defendants did, can leave no doubt of that. The libelous attacks upon the plaintiffs, their business, their employees, and their customers, and the abusive epithets applied to them were palpable wrongs. They were uttered in aid of the plan to induce plaintiffs' customers and would-be customers to refrain from patronizing the plaintiffs. The patrolling of defendants immediately in front of the restaurant on the main street and within five feet of plaintiffs' premises continuously during business hours, with the banners announcing plaintiffs' unfairness; the attendance by the picketers at the entrance to the restaurant and their insistent and loud appeals all day long, the constant circulation by them of the libels and epithets applied to employees, plaintiffs and customers, and the threats of injurious consequences to future customers, all linked together in a campaign, were an unlawful annoyance and a hurtful nuisance in respect of the free access to the plaintiffs' place of business. It was not lawful persuasion or inducing. It was not a mere appeal to the sympathetic aid of would-be customers by a simple statement of the

fact of the strike and a request to withhold patronage. It was compelling every customer or would-be customer to run the gauntlet of most uncomfortable publicity, aggressive and annoying importunity, libelous attacks and fear of injurious consequences, illegally inflicted, to his reputation and standing in the community. No wonder that a business of $50,000 was reduced to only one-fourth of its former extent. Violence could not have been more effective. It was moral coercion by illegal annoyance and obstruction and it thus was plainly a conspiracy.

It would consume too great space to refer to the mass of authority which sustains this conclusion. It is sufficient to cite the general discussion of the subject in *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 439. Well known decisions on similar facts are *Sherry* v. *Perkins,* 147 Mass. 212; *Barr* v. *Essex Trades Council,* 53 N. J. Eq. 101; *Purvis* v. *Local No. 500,* 214 Pa. St. 348; *Wilson* v. *Hey,* 232 Ill. 389; *Casey* v. *Cincinnati Typographical Union,* 45 Fed. 135; *Pierce* v. *Stablemen's Union,* 156 Cal. 70.

A law which operates to make lawful such a wrong as is described in plaintiffs' complaint deprives the owner of the business and the premises of his property without due process, and can not be held valid under the Fourteenth Amendment.

The opinion of the State Supreme Court in this case if taken alone seems to show that the statute grants complete immunity from any civil or criminal action to the defendants, for it pronounces their acts lawful. If, however, we are to assume that the criminal laws of Arizona do provide prosecution for such libels against the plaintiffs though committed by this particular class of tort feasors, (*Truax* v. *Bisbee Local No. 380,* 19 Ariz. 379), still the tort here committed was not a mere libel of plaintiffs. That would not have had any such serious consequences. The libel of the plaintiffs here was not the cause of the

injury; it was only one step or link in a conspiracy, unlawfully to influence customers.

It is argued that, while the right to conduct a lawful business is property, the conditions surrounding that business, such as regulations of the State for maintaining peace, good order, and protection against disorder, are matters in which no person has a vested right. The conclusion to which this inevitably leads in this case is that the State may withdraw all protection to a property right by civil or criminal action for its wrongful injury if the injury is not caused by violence. This doctrine is supposed to find support in the case of *New York Central R. R. Co.* v. *White*, 243 U. S. 188, 198, and cases there cited. These cases, all of them, relate to the liabilities of employers to employees growing out of the relation of employment for injuries received in the course of employment. They concern legislation as to the incidents of that relation. They affirm the power of the State to vary the rules of the common law as to the fellow servant doctrine, assumption of risk, and negligence, in that relation. They hold that employers have no vested right in those rules of the common law. The broad distinction between one's right to protection against a direct injury to one's fundamental property right by another who has no special relation to him, and one's liability to another with whom he establishes a voluntary relation under a statute is manifest upon its statement. It is true that no one has a vested right in any particular rule of the common law, but it is also true that the legislative power of a State can only be exerted in subordination to the fundamental principles of right and justice which the guaranty of due process in the Fourteenth Amendment is intended to preserve, and that a purely arbitrary or capricious exercise of that power whereby a wrongful and highly injurious invasion of property rights, as here, is practically sanctioned and the

owner stripped of all real remedy, is wholly at variance with those principles.

It is to be observed that this is not the mere case of a peaceful secondary boycott as to the illegality of which courts have differed and States have adopted different statutory provisions. A secondary boycott of this kind is where many combine to injure one in his business by coercing third persons against their will to cease patronizing him by threats of similar injury. In such a case the many have a legal right to withdraw their trade from the one, they have the legal right to withdraw their trade from third persons, and they have the right to advise third persons of their intention to do so when each act is considered singly. The question in such cases is whether the moral coercion exercised over a stranger to the original controversy by steps in themselves legal becomes a legal wrong. But here the illegality of the means used is without doubt and fundamental. The means used are the libelous and abusive attacks on the plaintiffs' reputation, like attacks on their employees and customers, threats of such attacks on would-be customers, picketing and patrolling of the entrance to their place of business, and the consequent obstruction of free access thereto—all with the purpose of depriving the plaintiffs of their business. To give operation to a statute whereby serious losses inflicted by such unlawful means are in effect made remediless, is, we think, to disregard fundamental rights of liberty and property and to deprive the person suffering the loss of due process of law.

If, however, contrary to the construction which we put on the opinion of the Supreme Court of Arizona, it does not withhold from the plaintiffs all remedy for the wrongs they suffered but only the equitable relief of injunction, there still remains the question whether they are thus denied the equal protection of the laws.

The Arizona constitution provides that the superior court shall have jurisdiction in all cases of equity and, in pursuance of this provision, Paragraph 1456 of the Revised Statutes of Arizona, 1913, declares:

"Judges of the superior courts may grant writs of injunction, returnable to said courts, in the following cases:

" 1. Where it shall appear that the party applying for such writ is entitled to the relief demanded, and such relief or any part thereof requires the restraint of some act prejudicial to the applicant. .

" 2. Where, pending litigation, it shall be made to appear that a party is doing some act respecting the subject of litigation, or threatens, or is about to do some act, or is procuring or suffering the same to be done, in violation of the rights of the applicant, which act would tend to render the judgment ineffectual. .

" 3. In all other cases where the applicant for such writ may show himself entitled thereto under the principles of equity."

The necessary effect of these provisions and of Paragraph 1464 is that the plaintiffs in error would have had the right to an injunction against such a campaign as that conducted by the defendants in error, if it had been directed against the plaintiffs' business and property in any kind of a controversy which was not a dispute between employer and former employees. If the competing restaurant keepers in Bisbee had inaugurated such a campaign against the plaintiffs in error and conducted it with banners and handbills of a similar character, an injunction would necessarily have issued to protect the plaintiffs in the enjoyment of their property and business.

This brings us to consider the effect in this case of that provision of the Fourteenth Amendment which forbids any State to deny to any person the equal protection of the laws. The clause is associated in the Amendment

with the due process clause and it is customary to consider them together. It may be that they overlap, that a violation of one may involve at times the violation of the other, but the spheres of the protection they offer are not coterminous. The due process clause, brought down from Magna Charta, was found in the early state constitutions, and later in the Fifth Amendment to the Federal Constitution as a limitation upon the executive, legislative and judicial powers of the Federal Government, while the equality clause does not appear in the Fifth Amendment and so does not apply to congressional legislation. The due process clause requires that every man shall have the protection of his day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. *Hurtado v. California,* 110 U. S. 516, 535. It, of course, tends to secure equality of law in the sense that it makes a required minimum of protection for every one's right of life, liberty and property, which the Congress or the legislature may not withhold. Our whole system of law is predicated on the general, fundamental principle of equality of application of the law. "All men are equal before the law," "This is a government of laws and not of men," "No man is above the law," are all maxims showing the spirit in which legislatures, executives and courts are expected to make, execute and apply laws. But the framers and adopters of this Amendment were not content to depend on a mere minimum secured by the due process clause, or upon the spirit of equality which might not be insisted on by local public opinion. They therefore embodied that spirit in a specific guaranty.

The guaranty was aimed at undue favor and individual or class privilege, on the one hand, and at hostile dis-

crimination or the oppression of inequality, on the other. It sought an equality of treatment of all persons, even though all enjoyed the protection of due process. Mr. Justice Field, delivering the opinion of this court in *Barbier* v. *Connolly,* 113 U. S. 27, 32, of the equality clause, said—" Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment." In *Hayes* v. *Missouri,* 120 U. S. 68, the court speaking through the same Justice said the Fourteenth Amendment " does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." Thus the guaranty was intended to secure equality of protection not only for all but against all similarly situated. Indeed, protection is not protection unless it does so. Immunity granted to a class, however limited, having the effect to deprive another class, however limited, of a personal or property right, is just as clearly a denial of equal protection of the laws to the latter class as if the immunity were in favor of, or the deprivation of right permitted worked against, a larger class.

Mr. Justice Matthews, in *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369, speaking for the court of both the due process and the equality clause of the Fourteenth Amendment, said:

" These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; *and the equal protection of the laws is a pledge of the protection of equal laws.*"

The accuracy and comprehensive felicity of this description of the effect of the equality clause are shown by the frequency with which it has been quoted in the decisions of this court. It emphasizes the additional guaranty of a right which the clause has conferred beyond the requirement of due process.

With these views of the meaning of the equality clause, it does not seem possible to escape the conclusion that by the clauses of Paragraph 1464 of the Revised Statutes of Arizona, here relied on by the defendants, as construed by its Supreme Court, the plaintiffs have been deprived of the equal protection of the law.

It is beside the point to say that plaintiffs had no vested right in equity relief and that taking it away does not deprive them of due process of law. If, as is asserted, the granting of equitable remedies falls within the police power and is a matter which the legislature may vary as its judgment and discretion shall dictate, this does not meet the objection under the equality clause which forbids the granting of equitable relief to one man and the denying of it to another under like circumstances and in the same territorial jurisdiction. The Fourteenth Amendment, as this court said in *Barbier* v. *Connolly,* already cited, intended " not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; *that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts;* that no impediment should be interposed to the pursuits of any one except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one

than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offences."

If, as claimed, the legislature has full discretion to grant or withhold equitable relief in any class of cases, indeed to take away from its courts all equity jurisdiction and leave those who are wronged to suits at law or to protection by the criminal law, the legislature has the same power in respect to the declaration of crimes. Suppose the legislature of the State were to provide that such acts as were here committed by defendants, to wit, the picketing or patrolling of the sidewalk and street in front of the store or business house of any person and the use of handbills of an abusive and libelous character against the owner and present and future customers with intent to injure the business of the owner, should be a public nuisance and be punishable by fine and imprisonment, and were to except ex-employees from its penal provisions. Is it not clear that any defendant could escape punishment under it on the ground that the statute violated the equality clause of the Fourteenth Amendment? That is the necessary effect of *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, where an anti-trust act was held invalid under this same clause because it contained the excepting provision that it should "not apply to agricultural products or live stock while in the hands of the producer or raiser." That was a stronger case than this because there the whole statute was one dealing with economic policy and was a declaration of *mala prohibita* that had theretofore been lawful, from which it was strongly argued that the exception was justified in the interest of agriculture, and was a proper exception by permissible classification. Here is a direct invasion of the ordinary business and property rights of a person, unlawful when committed by any one, and remediable because

of its otherwise irreparable character by equitable process, except when committed by ex-employees of the injured person. If this is not a denial of the equal protection of the laws, then it is hard to conceive what would be. To hold it not to be, would be, to use the expression of Mr. Justice Brewer in *Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis,* 165 U. S. 150, 154, to make the guaranty of the equality clause " a rope of sand."

In *Missouri* v. *Lewis,* 101 U. S. 22, we find one of the earlier and one of the most helpful discussions of the application of the equality clause to judicial procedure by Mr. Justice Bradley speaking for this court. In that case one who had been disbarred by the Court of Appeals of St. Louis sought to avoid the effect of this action by the contention that he was denied the equal protection of the laws because he was not given the right of appeal to the Supreme Court of the State, granted to litigants in the State, except in St. Louis and three other counties. It was held that the equality clause did not apply because the state legislature had the right to vary the system of courts and procedure in various parts of the State. Mr. Justice Bradley said (p. 30):

" The last restriction, as to the equal protection of the laws, is not violated by any diversity in the jurisdiction of the several courts as to subject-matter, amount, or finality of decision, if all persons within the territorial limits of their respective jurisdictions have an equal right, in like cases and under like circumstances, to resort to them for redress." Again (p. 31):

" For, as before said, it [i. e., the equality clause] has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances."

To sustain the distinction here between the ex-employees and other tort feasors in the matter of remedies

against them, it is contended that the legislature may establish a class of such ex-employees for special legislative treatment. In adjusting legislation to the need of the people of a State, the legislature has a wide discretion and it may be fully conceded that perfect uniformity of treatment of all persons is neither practical nor desirable, that classification of persons is constantly necessary and that questions of proper classification are not free from difficulty. But we venture to think that not in any of the cases in this court has classification of persons of sound mind and full responsibility, having no special relation to each other, in respect of remedial procedure for an admitted tort been sustained. Classification must be reasonable. As was said in *Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis,* 165 U. S. 155, classification " must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without such basis." As was said in *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 293: " The rule [i. e., of the equality clause] is not a substitute for municipal law; it only prescribes that that law have the attribute of equality of operation, and equality of operation does not mean indiscriminate operation on persons merely as such, but on persons according to their relations." The same principle is repeated and enforced in *Southern Ry. Co.* v. *Greene,* 216 U. S. 400, 417: " While reasonable classification is permitted, without doing violence to the equal protection of the laws, such classification must be based upon some real and substantial distinction, bearing a reasonable and just relation to the things in respect to which such classification is imposed; and classification cannot be arbitrarily made without any substantial basis." Classification is the most inveterate of our reasoning processes. We can scarcely think or speak without consciously or unconsciously exercising it. It must therefore obtain in

and determine legislation; but it must regard real re-semblances and real differences between things, and per-sons, and class them in accordance with their pertinence to the purpose in hand. Classification like the one with which we are here dealing is said to be the development of the philosophic thought of the world and is opening the door to legalized experiment. When fundamental rights are thus attempted to be taken away, however, we may well subject such experiment to attentive judgment. The Constitution was intended, its very purpose was, to pre-vent experimentation with the fundamental rights of the individual. We said through Mr. Justice Brewer, in *Muller* v. *Oregon,* 208 U. S. 412, that " it is the peculiar value of a written constitution that it places in unchang-ing form limitations upon legislative action, and thus gives a permanence and stability to popular government which otherwise would be lacking. '

It is urged that this court has frequently recognized the special classification of the relations of employees and em-ployers as proper and necessary for the welfare of the community and requiring special treatment. This is un-doubtedly true, but those cases, the *Second Employers' Liability Cases,* 223 U. S. 1; *New York Central R. R. Co.* v. *White,* 243 U. S. 188; *Hawkins* v. *Bleakly;* 243 U. S. 210; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Middleton* v. *Texas Power & Light Co.,* 249 U. S. 152, and *Arizona Employers' Liability Cases,* 250 U. S. 400, as we have already pointed out in discussing the due process clause, were cases of the responsibility of the employer for injuries sustained by employees in the course of their employment. The general end of such legislation is that the employer shall become the insurer of the employee against injuries from the employment without regard to the negligence, if any, through which it occurred, leaving to the employer to protect himself by insurance and to compensate himself for the additional cost of production

by adding to the prices he charges for his products. It seems a far cry from classification on the basis of the relation of employer and employee in respect of injuries received in course of employment to classification based on the relation of an employer, not to an employee, but to one who has ceased to be so, in respect of torts thereafter committed by such ex-employee on the business and property right of the employer. It is really a little difficult to say, if such classification can be sustained, why special legislative treatment of assaults upon an employer or his employees by ex-employees may not be sustained with equal reason. It is said the State may deal separately with such disputes because such controversies are a frequent and characteristic outgrowth of disputes over terms and conditions of employment. Violence of ex-employees toward present employees is also a characteristic of such disputes. Would this justify a legislature in excepting ex-employees from criminal prosecution for such assaults and leaving the assaulted persons to suits for damages at common law?

Our conclusion, that plaintiffs are denied the equal protection of the laws, is sustained by the decisions in this court in *Truax* v. *Raich,* 239 U. S. 33; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Vosburg,* 238 U. S. 56; *Southern Ry. Co.* v. *Greene,* 216 U. S. 400; *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540; *Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79; *Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis,* 165 U. S. 150. In the state courts, we find equal support for it. *Bogni* v. *Perotti,* 224 Mass. 152; *Pearson* v. *Portland,* 69 Me. 278; *Goldberg, Bowen & Co.* v. *Stablemen's Union,* 149 Cal. 429, 434; *Pierce* v. *Stablemen's Union,* 156 Cal. 70, 74; *Funkhouser* v. *Randolph,* 287 Ill. 94; *Houston* v. *Pulitzer Publishing Co.,* 249 Mo. 332; *Phipps* v. *Wisconsin Central Ry. Co.,* 133 Wisc. 153; *Park* v. *Detroit Free Press Co.,* 72 Mich. 560; *C., N. O. & T. P. Ry. Co.* v. *Clark & Bennett,* 11 Ky. Law Rep. 286.

It is urged that in holding Paragraph 1464 invalid, we are in effect holding invalid § 20 of the Clayton Act. Of course, we are not doing so. In the first place, the equality clause of the Fourteenth Amendment does not apply to congressional but only to state action. In the second place, § 20 of the Clayton Act never has been construed or applied as the Supreme Court of Arizona has construed and applied Paragraph 1464 in this case.

We have but recently considered the clauses of § 20 of the Clayton Act, sometimes erroneously called the "picketing" clauses. *American Steel Foundries* v. *Tri-City Central Trades Council, ante,* 184. They forbid an injunction in labor controversies prohibiting any person "from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do."

We held that under these clauses picketing was unlawful, and that it might be enjoined as such, and that peaceful picketing was a contradiction in terms which the statute sedulously avoided, but that, subject to the primary right of the employer and his employees and would-be employees to free access to his premises without obstruction by violence, intimidation, annoyance, importunity or dogging, it was lawful for ex-employees on a strike and their fellows in a labor union to have a single representative at each entrance to the plant of the employer to announce the strike and peaceably to persuade the employees and would-be employees to join them in it. We held that these clauses were merely declaratory of what had always been the law and the best practice in equity, and we thus applied them. The construction put

upon the same words by the Arizona Supreme Court makes these clauses of Paragraph 1464 as far from those of § 20 of the Clayton Act in meaning as if they were in wholly different language.

We conclude that the demurrer in this case should have been overruled, the defendants required to answer, and that if the evidence sustained the averments of the complaint, an injunction should issue as prayed.

Objection is made to this conclusion on the ground that as we hold certain clauses of Paragraph 1464 of the Arizona Code, as construed, invalid, they can not be separated from Paragraph 1456 which must also be held invalid and then there is no law in Arizona authorizing an injunction in this or any case. *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, is cited to sustain this view. There a new anti-trust statute was enacted making criminal and subject to injunction what before had not been so. The exception from its operation of products of the farm in the hands of the producers, contained in the law as enacted, was declared to be a denial of equal protection of the laws, and the whole law was declared invalid because the court in view of the exception could not assume that the legislature would have enacted the law, had it known that the producers of farm products would have come within its terms. But here the case is quite different. Paragraph 1456 has been the statute law of Arizona, State and Territory, since 1901. It was first adopted in the Code of the Territory of 1901. It was continued in force, by virtue of the new constitution of Arizona adopted by the people in 1912, which merely changed the name of the court, upon which general equity jurisdiction was conferred, from the District Court to the Superior Court, and which provided that the authority, jurisdiction, practice and procedure of the district courts should continue in force and apply and govern superior courts until altered or repealed. Arizona came into the

Union with this constitution February 14, 1912. At the session of 1912 provision was made for revision and codification of the laws. The present Code was adopted by the legislature at its third special session of 1913. Paragraph 1464 was passed, as the Code itself states, at the second session of 1913. Thus Paragraph 1464 was an amendment to Paragraph 1456, and was included with the original section in the code revision of 1913. To invalidate Paragraph 1456 we must assume that had the legislature known that the clauses of Paragraph 1464 here involved, construed as the Arizona Supreme Court has construed them, were unconstitutional, it would have repealed all the existing law conferring the equitable power of injunction on its first instance courts of general jurisdiction. We can not make this assumption. The exception introduced by amendment to Paragraph 1456 proving invalid, the original law stands without the amendatory exception.

> *The judgment of the Supreme Court of Arizona is reversed and the case remanded for further proceedings not inconsistent with this opinion.*

MR. JUSTICE HOLMES, dissenting.

The dangers of a delusive exactness in the application of the Fourteenth Amendment have been adverted to before now. *Louisville & Nashville R. R. Co.* v. *Barber Asphalt Paving Co.,* 197 U. S. 430, 434. Delusive exactness is a source of fallacy throughout the law. By calling a business "property" you make it seem like land, and lead up to the conclusion that a statute cannot substantially cut down the advantages of ownership existing before the statute was passed. An established business no doubt may have pecuniary value and commonly is protected by law against various unjustified injuries. But you cannot give it definiteness of contour by calling it a thing. It is a course of conduct and like other conduct is

subject to substantial modification according to time and circumstances both in itself and in regard to what shall justify doing it a harm. I cannot understand the notion that it would be unconstitutional to authorize boycotts and the like in aid of the employees' or the employers' interest by statute when the same result has been reached constitutionally without statute by Courts with whom I agree. See *The Hamilton,* 207 U. S. 398, 404. In this case it does not even appear that the business was not created under the laws as they now are. *Denny* v. *Bennett,* 128 U. S. 489.

I think further that the selection of the class of employers and employees for special treatment, dealing with both sides alike, is beyond criticism on principles often asserted by this Court. ·And especially I think that without legalizing the conduct complained of the extraordinary relief by injunction may be denied to the class. Legislation may begin where an evil begins. If, as many intelligent people believe, there is more danger that the injunction will be abused in labor cases than elsewhere I can feel no doubt of the power of the legislature to deny it in such cases. I refer to two decisions in which I have stated what I understand to be the law sanctioned by many other decisions. *Carroll* v. *Greenwich Insurance Co.,* 199 U. S. 401, 411. *Quong Wing* v. *Kirkendall,* 223 U. S. 59.

In a matter like this I dislike to turn attention to anything but the fundamental question of the merits, but *Connolly* v. *Union Sewer Pipe Co.,* 184 U. S. 540, raises at least a doubt in my mind of another sort. The exception and the rule as to granting injunctions are both part of the same code, enacted at the same time. If the exception fails, according to the *Connolly Case* the statute is bad as a whole. It is true that here the exception came in later than the rule, but after they had been amalgamated in a single act I cannot know that the later legis-

lature would have kept the rule if the exception could not be allowed. If labor had the ascendancy that the exception seems to indicate, I think that probably it would have declined to allow injunctions in any case if that was the only way of reaching its end. But this is a matter upon which the State Court has the last word, and if it takes this view its decision must prevail. I need not press further the difficulty of requiring a State Court to issue an injunction that it never has been empowered to issue by the quasi-sovereign that created the Court.

I must add one general consideration. There is nothing that I more deprecate than the use of the Fourteenth Amendment beyond the absolute compulsion of its words to prevent the making of social experiments that an important part of the community desires, in the insulated chambers afforded by the several States, even though the experiments may seem futile or even noxious to me and to those whose judgment I most respect. I agree with the more elaborate expositions of my brothers Pitney and Brandeis and in their conclusion that the judgment should be affirmed.

MR. JUSTICE PITNEY, with whom concurred MR. JUSTICE CLARKE, dissenting.

The Supreme Court of the State of Arizona sustained, against objections raised by plaintiffs in error under the " due process of law " and " equal protection " clauses of the Fourteenth Amendment, a statutory provision found in Paragraph 1464, Arizona Civil Code 1913, which restricts the employment of the process of injunction against what are called peaceful picketing and boycotting under certain circumstances, in terms similar to those found in § 20 of the Clayton Act of Congress (October 15, 1914, c. 323, 38 Stat. 730, 738).[1]

---

[1] 1464. No restraining order or injunction shall be granted by any court of this state, or a judge or the judges thereof, in any case be-

Plaintiffs in error, who were plaintiffs in the trial court and appellants in the Supreme Court of the State, were engaged in the business of conducting a restaurant in Bisbee, enjoying and dependent for success upon the good will, custom, and patronage of the public; defendants had been employed, in one capacity or another, in the restaurant, and were members of a local labor union. A dispute arose concerning the terms and conditions of the employment, and in the course of it demands were made upon plaintiffs by the union, with which plaintiffs refused to comply. Because of this the union ordered a strike of all its members then employed by plaintiffs, and defendants joined in the strike and left plaintiffs' employ. Thereupon, for the purpose of winning the strike and

tween an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving or growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property or to a property right of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

And no such restraining order or injunction shall prohibit any person or persons from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at or near a house or place where any person resides or works, or carries on business, or happens to be for the purpose of peaceably obtaining or communicating information, or of peaceably persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute; or from recommending, advising, or persuading others by peaceful means so to do; or from paying or giving to or withholding from any person engaged in such dispute any strike benefits or other moneys or things of value; or from peaceably assembling at any place in a lawful manner and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto.

coercing plaintiffs into complying with the demands of the union, defendants and numerous other persons unknown combined to inaugurate and did inaugurate a boycott of plaintiffs and their restaurant business, in order to induce plaintiffs' customers and patrons to refrain from patronizing the restaurant. In furtherance of the boycott defendants caused persons to walk back and forth along the street in front of the restaurant and near to the entrance during business hours, carrying banners bearing conspicuous notices denouncing plaintiffs as unfair to organized labor, etc., and caused printed handbills to be distributed among plaintiffs' customers and patrons recommending and attempting to persuade them to refrain from patronizing the restaurant. Having sustained serious pecuniary loss, and being threatened with further and irreparable damage, plaintiffs brought suit for injunction, setting up that defendants were relying upon the provisions of Paragraph 1464 of the Civil Code, and praying that this might be held violative of the Fourteenth Amendment and that they might have an injunction and other relief.

The Supreme Court, conceding that prior to the enactment of Paragraph 1464 picketing carried on in any manner, even in a concededly peaceable manner, was unlawful by the law of Arizona, nevertheless, upon authority of a previous case decided by it upon substantially identical facts (*Truax* v. *Bisbee Local No. 380*, 19 Ariz. 379, 392), held that relief was barred by the statute. 20 Ariz. 7.

Upon the facts, it hardly could be said that defendants kept within the bounds of a " peaceful " picket or boycott. They appear to have gone beyond mere attempts to persuade plaintiffs' customers to withdraw their patronage, and to have resorted to abusive and threatening language towards the patrons themselves. The court declared, however, that the statute established a new rule

of evidence for determining whether picketing was peaceful and not otherwise unlawful; and that, measured by the standard thus prescribed, defendants were not subject to injunction. By this construction we are bound, and the only question is whether by the statute as so construed, and as applied to the facts of the case, plaintiffs are deprived of rights secured to them by the Fourteenth Amendment.

As to this, I regret that I am not in accord with the views of the majority of the court. Expressing no opinion as to the wisdom, or policy, or propriety in the general sense, of Paragraph 1464—with neither of which is our duty concerned—I consider first, whether, as construed and applied, it has the effect of depriving plaintiffs in error of their liberty or property without due process of law.

It is beside the question to discuss whether, under the rules of the common law or the general principles of justice, picketing or boycotting, or the conduct of defendants however described, is lawful. The Supreme Court of Arizona virtually conceded that in that State, in the absence of statute, they were not. The question is whether in this respect the law might be altered by act of legislation, to the extent of depriving a party aggrieved, and threatened with irreparable injury, of relief by injunction.

That the right to conduct a lawful business, and thereby acquire pecuniary profits, is property, is indisputable. That the state of society, and the existing condition of good order, or the opposite, surrounding the business, and its liability to or immunity from interruption through particular forms of disorder, affect its profitableness, likewise is plain. But it seems to me clear that, so far as these result from the general operation of the laws and regulations established by authority of the State for maintaining the peace, good order, and tranquility of its people and affording protection against disturbing ele-

ments and ill-disposed persons, those laws and regulations, as rules of conduct and measures of relief, are subject to be changed in the normal exercise of the legislative power of the State. That no person has a vested interest in any rule of law, entitling him to have it remain unaltered for his benefit, is a principle thoroughly settled by numerous decisions of this court, and having general application, not confined at all to the rights and liabilities existing between employers and employees, or between persons formerly occupying that relation. *Munn* v. *Illinois,* 94 U. S. 113, 134; *Hurtado* v. *California,* 110 U. S. 516, 532; *Second Employers' Liability Cases,* 223 U. S. 1, 50; *Chicago & Alton R. R. Co.* v. *Tranbarger,* 238 U. S. 67, 76; *New York Central R. R. Co.* v. *White,* 243 U. S. 188, 198.

The use of the process of injunction to prevent disturbance of a going business by such a campaign as defendants here have conducted, is in the essential sense a measure of police regulation. And just as the States have a broad discretion about establishing police regulations, so they have a discretion, equally broad, about modifying and relaxing them. They may adopt the common law, or some other system, as their own judgment of the interests of their people may determine. They have general dominion, and, saving as restricted by particular provisions of the Federal Constitution, complete dominion over all persons, property, and business transactions within their borders; and in regulating its internal affairs a State may establish by legislation a policy differing in one or more respects from those of other States, just as it might establish a like difference through the decisions of its courts.

Hence, I have no doubt that, without infringing the "due process" clause, a State might by statute establish protection against picketing or boycotting however conducted, just as many States have done by holding them to be contrary to the common law, recognizing a property

value in a going business, and applying equitable principles in safeguarding it from irreparable injury through interference found unwarranted. *Vegelahn* v. *Guntner,* 167 Mass. 92, 97–98; *Beck* v. *Railway Teamsters' Protective Union,* 118 Mich. 497, 520–521; *Barnes & Co.* v. *Chicago Typographical Union,* 232 Ill. 424, 435, 437; *Jensen* v. *Cooks' & Waiters' Union,* 39 Wash. 531, 536; *St. Germain* v. *Bakery & Confectionery Workers' Union,* 97 Wash. 282, 289, 295; *Jonas Glass Co.* v. *Glass Bottle Blowers' Association,* 77 N. J. Eq. 219, 222–224. And, just as one State might establish such protection by statute, so another State may by statute disestablish the protection, even as States have differed in their judicial determination of the general law upon the subject. In neither case can I find ground for declaring that the State's action is so arbitrary and devoid of reasonable basis that it can be called a deprivation of liberty or property without due process of law, in the constitutional sense. In truth, the States have a considerable degree of latitude in determining, each for itself, their respective conditions of law and order, and what kind of civilization they shall have as a result.

Paragraph 1464 does not modify any substantive rule of law, but only restricts the processes of the courts of equity. Ordinary legal remedies remain; and I cannot believe that the use of the injunction in such cases— however important—is so essential to the right of acquiring, possessing and enjoying property that its restriction or elimination amounts to a deprivation of liberty or property without due process of law, within the meaning of the Fourteenth Amendment.

Secondly, it is said that Paragraph 1464, Arizona Civil Code, denies to plaintiffs in error the " equal protection of the laws; " but it seems to me evident that it does not offend in this regard. Examination shows that it does not discriminate against the class to which plaintiffs belong

in favor of any other. It applies not only to cases between employers and employees, irrespective of who is plaintiff and who defendant, but to cases between employees, and between persons employed and those seeking employment. And it applies equally to all persons coming within its reach.

It is said that because, under other provisions of the Arizona statute law, plaintiffs would have been entitled to an injunction against such a campaign as that conducted by defendants, had it been in a controversy other than a dispute between employer and former employees—for instance, had competing restaurant-keepers been the offenders—refusal of relief in the particular case by force of Paragraph 1464 is undue favoritism to the class of which defendants are members. But I submit with deference that this is not a matter of which plaintiffs are entitled to complain under the " equal protection " clause. There is no discrimination *as against them;* others situated like them are accorded no greater right to an injunction than is accorded to them. Whatever complaint the competing restaurant-keepers might have, if in the case supposed they were subject to be stopped by an injunction where former employees were not, it would not be a denial of equal protection to plaintiffs. Cases arising under this clause of the Fourteenth Amendment, preeminently, call for the application of the settled rule that before one may be heard to oppose state legislation upon the ground of its repugnance to the Federal Constitution he must bring himself within the class affected by the alleged unconstitutional feature. *Rosenthal* v. *New York,* 226 U. S. 260, 270–271; *Jeffrey Manufacturing Co.* v. *Blagg,* 235 U. S. 571, 576; *Arkadelphia Milling Co.* v. *St. Louis Southwestern Ry. Co.,* 249 U. S. 134, 149; *Middleton* v. *Texas Power & Light Co.,* 249 U. S. 152, 156–157.

A disregard of the rule in the present case has resulted, as it seems to me, in treating as a discrimination what, so

far as plaintiffs are concerned, is no more than a failure to include in the statute a case which in consistency ought, it is said, to have been covered—an omission immaterial to plaintiffs. This is to transform the provision of the Fourteenth Amendment from a guaranty of the " protection of equal laws " into an insistence upon laws complete, perfect, symmetrical.

The guaranty of " equal protection " entitles plaintiffs to treatment not less favorable than that given to others similarly circumstanced. This the present statute gives them. The provision does not entitle them, as against their present opponents under present circumstances, to protection as adequate as they might have against opponents of another class under like circumstances. I find no authority for the proposition that the guaranty was intended to secure equality of protection " not only for all but against all similarly situated," except as between persons who properly belong in the same class. The familiar expression, in *Barbier* v. *Connolly,* 113 U. S. 27, 32, " Class legislation, discriminating against some and favoring others," refers to a discrimination which at the same time favors others similarly situated. The same is true of what was said in *Hayes* v. *Missouri,* 120 U. S. 68, 71–72, to the effect that the Amendment " merely requires that all persons subjected to such legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." Other decisions are to the same effect. Nothing in the Arizona statute under consideration, either as written or as construed and applied, operates to discriminate against plaintiffs in favor of others similarly circumstanced and conditioned. Neither class of supposed offenders—those exempt from or those subject to injunction—stands in like case with plaintiffs who seek an injunction.

But, assuming plaintiffs were entitled to assert, as a denial of equal protection, the alleged discrimination aris-

ing from a denial of equitable relief in one class of cases which would be granted in another, I am unable to see that the statute creates an arbitrary and unreasonable discrimination in this regard.

It is going far—too far, I submit—to assume that there is any discrimination in fact. Such a campaign as that conducted by defendants, the legislature foresaw, was likely to be resorted to by employees or former employees, in the case of a dispute with the employer concerning terms or conditions of employment. In such a case, for reasons deemed sufficient, the legislature declared there should be no injunction. That such picketing or boycotting ever was conducted in Arizona, or that the legislature had reason to anticipate that it would be undertaken in the future, by competitors in business or any others than participants in a labor dispute, does not appear and cannot be assumed. Without this, the supposed discrimination is but theoretical, not practical.

But were there actual discrimination, granting immunity from injunction to laboring men who resort to unlawful conduct in the way of picketing, boycotting and the like, seriously interfering with the employer's business, while denying the like immunity to other classes who may resort to similar unlawful and harmful conduct but with what the legislature probably regarded as a slighter claim to indulgence, I cannot agree that this demonstrates the classification to be so arbitrary and unreasonable as to render the act a denial of the equal protection of the laws. Doubtless the legislature, upon a review of the subject in the light of a knowledge of conditions in their own State that we do not possess, concluded that in labor controversies there were reasons affecting the public interest for preventing resort to the process of injunction and leaving the parties to the ordinary legal remedies, which reasons did not apply generally. The simple truth is, they merely singled out, as properly they

might, a particular kind of controversy for what they regarded as appropriate treatment; and, as already shown, they acted upon it in a manner consistent with due process of law. There is here no denial of equal protection. Legislation almost of necessity proceeds subject by subject, with classification as an essential part of the process. In adjusting their laws to the needs of the people the States have a wide range of discretion about classification; the equal protection clause does not require that all state laws shall be perfect and complete, nor that the entire field of proper legislation shall be covered by a single act; and it is not a valid objection that a law made applicable to one subject might properly have been extended to others. *Rosenthal* v. *New York,* 226 U. S. 260, 270–271; *Missouri, Kansas & Texas Ry. Co.* v. *Cade,* 233 U. S. 642, 649–650. All employers' liability and workmen's compensation laws proceed upon the basis that the responsibility of employers for injuries sustained by employees forms a proper subject for separate treatment. See *Second Employers' Liability Cases,* 223 U. S. 1; *New York Central R. R. Co.* v. *White,* 243 U. S. 188; *Hawkins* v. *Bleakly,* 243 U. S. 210; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Middleton* v. *Texas Power & Light Co.,* 249 U. S. 152; *Arizona Employers' Liability Cases,* 250 U. S. 400. And I see no adequate reason for denying the authority of a State to deal separately with those controversies between employer and employees or between persons employed and those seeking employment, which experience has shown to be a characteristic outgrowth of disputes over the terms and conditions of employment.

I am unable to conclude that Paragraph 1464 either deprives plaintiffs in error of liberty or property without due process of law, or denies to them the equal protection of the laws, within the meaning of the Fourteenth Amendment.

MR. JUSTICE BRANDEIS, dissenting.

The first legislature of the State of Arizona adopted in 1913 a Civil Code. By Title 6, c. III, it sets forth conditions and circumstances under which the courts of the State may or may not grant injunctions. Paragraph 1464 contains, among other things, a prohibition against interfering by injunction between employers and employees, in any case growing out of a dispute concerning terms or conditions of employment, unless interposition by injunction is necessary to protect property from injury through violence. Its main purpose was doubtless to prohibit the courts from enjoining peaceful picketing and the boycott. With the wisdom of the statute we have no concern. Whether Arizona in enacting this statute transgressed limitations imposed upon the power of the States by the Fourteenth Amendment is the question presented for decision.

The employer has, of course, a legal right to carry on his business for profit; and incidentally the subsidiary rights to secure and retain customers, to fix such prices for his product as he deems proper, and to buy merchandise and labor at such prices as he chooses to pay. This right to carry on business—be it called liberty or property—has value; and, he who interferes with the right without cause renders himself liable. But for cause the right may be interfered with and even be destroyed. Such cause exists when, in the pursuit of an equal right to further their several interests, his competitors make inroads upon his trade, or when suppliers of merchandise or of labor make inroads upon his profits. What methods and means are permissible in this struggle of contending forces is determined in part by decisions of the courts, in part by acts of the legislatures. The rules governing the contest necessarily change from time to time. For conditions change; and, furthermore, the rules evolved, being merely experi-

ments in government, must be discarded when they prove to be failures.

Practically every change in the law governing the relation of employer and employee must abridge, in some respect, the liberty or property of one of the parties—if liberty and property be measured by the standard of the law theretofore prevailing. If such changes are made by acts of the legislature, we call the modification an exercise . of the police power. And, although the change may involve interference with existing liberty or property of individuals, the statute will not be declared a violation of the due process clause, unless the court finds that the interference is arbitrary or unreasonable or that, considered as a means, the measure has no real or substantial relation of cause to a permissible end.[1] Nor will such changes in the law governing contests between employer and employee be held to be violative of the equal protection clause, merely because the liberty or property of individuals in other relations to each other (for instance, as competitors in trade or as vendor and purchaser) would not, under similar circumstances, be subject to like abridgement. Few laws are of universal application. It is of the nature of our law that it has dealt not with man in general, but with him in relationships. That a peculiar relationship of individuals may furnish legal basis for the classification which satisfies the requirement of the Fourteenth Amendment[2] is clear. That the relation of em-

---

[1] *Muller* v. *Oregon,* 208 U. S. 412; *Dominion Hotel* v. *Arizona,* 249 U. S. 265.

[2] "The rule, therefore, is not a substitute for municipal law; it only prescribes that that law have the attribute of equality of operation, and equality of operation does not mean indiscriminate operation on persons merely as such, but on persons according to their relations." Mr. Justice McKenna in *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 293.

In *Fidelity Mutual Life Association* v. *Mettler,* 185 U. S. 308, and *Northwestern National Life Insurance Co.* v. *Riggs,* 203 U. S. 243,

ployer and employee affords a constitutional basis for legislation applicable only to persons standing in that relation has been repeatedly held by this court.[3]. The questions submitted are whether this statutory prohibition of the remedy by injunction is in itself arbitrary and so unreasonable as to deprive the employer of liberty or property without due process of law;—and whether limitation of this prohibition to controversies involving employment denies him equal protection of the laws.

Whether a law enacted in the exercise of the police power is justly subject to the charge of being unreasonable or arbitrary, can ordinarily be determined only by a consideration of the contemporary conditions, social, industrial and political, of the community to be affected thereby. Resort to such facts is necessary, among other things, in order to appreciate the evils sought to be

---

the relation of insurer and insured was made the subject of regulation; in *Western Union Telegraph Co.* v. *Commercial Milling Co.*, 218 U. S. 406; *Seaboard Air Line Ry.* v. *Seegers*, 207 U. S. 73; *Yazoo & Mississippi Valley R. R. Co.* v. *Jackson Vinegar Co.*, 226 U. S. 217, that of public utility and patron; in *Noble State Bank* v. *Haskell*, 219 U. S. 104, that of banker and depositor; in *St. Louis & San Francisco Ry. Co.* v. *Mathews*, 165 U. S. 1; *Missouri, Kansas & Texas Ry. Co.* v. *May*, 194 U. S. 267; and *Minneapolis & St. Louis Ry. Co.* v. *Emmons*, 149 U. S. 364, that of railway and adjoining landowner.

[3] *Holden* v. *Hardy*, 169 U. S. 366; *St. Louis, Iron Mountain & St. Paul Ry. Co.* v. *Paul*, 173 U. S. 404; *Tullis* v. *Lake Erie & Western R. R. Co.*, 175 U. S. 348; *Knoxville Iron Co.* v. *Harbison*, 183 U. S. 13; *Atkin* v. *Kansas*, 191 U. S. 207; *Great Southern Hotel Co.* v. *Jones*, 193 U. S. 532; *Minnesota Iron Co.* v. *Kline*, 199 U. S. 593; *Wilmington Star Mining Co.* v. *Fulton*, 205 U. S. 60; *Muller* v. *Oregon*, 208 U. S. 412; *McLean* v. *Arkansas*, 211 U. S. 539; *Louisville & Nashville R. R. Co.* v. *Melton*, 218 U. S. 36; *Mobile, Jackson & Kansas City R. R. Co.* v. *Turnipseed*, 219 U. S. 35; *Chicago, Rock Island & Pacific Ry. Co.* v. *Arkansas*, 219 U. S. 453; *Arizona Employers' Liability Cases*, 250 U. S. 400. Compare *Second Employers' Liability Cases*, 223 U. S. 1.

remedied and the possible effects of the remedy proposed. Nearly all legislation involves a weighing of public needs as against private desires; and likewise a weighing of relative social values. Since government is not an exact science, prevailing public opinion concerning the evils and the remedy is among the important facts deserving consideration; particularly, when the public conviction is both deep-seated and widespread and has been reached after deliberation.[4]. What, at any particular time, is the paramount public need is, necessarily, largely a matter of judgment. Hence, in passing upon the validity of a law challenged as being unreasonable, aid may be derived from the experience of other countries and of the several States of our Union in which the common law and its conceptions of liberty and of property prevail. The history of the rules governing contests between employer and employed in the several English-speaking countries illustrates both the susceptibility of such rules to change and the variety of contemporary opinion as to what rules will best serve the public interest. The divergence of opinion in this difficult field of governmental action should admonish us not to declare a rule arbitrary and unreasonable merely because we are convinced that it is fraught with danger to the public weal, and thus to close the door to experiment within the law.

In England a workingman struggling to improve his condition, even when acting singly, was confronted until 1813 with laws limiting the amount of wages which he might demand.[5] Until 1824 he was punishable as a criminal if he combined with his fellow workmen to raise wages or shorten hours or to affect the business in any

---

[4] *Muller* v. *Oregon*, 208 U. S. 412, 420.

[5] 53 Geo. 3, c. 40. For the earlier law see, for instance, 23 Edw. 3, c. 1–8; 25 Edw. 3, c. 1–7, The Statutes of Laborers; 5 Eliz., c. 4; 1 Jac. 1, c. 6.

way, even if there was no resort to a strike.[6]   Until 1871
members of a union who joined in persuading employees
to leave work were liable criminally, although the em-
ployees were not under contract and the persuasion was
both peaceful and unattended by picketing.[7]   Until 1871
threatening a strike, whatever the cause, was also a
criminal act.[8]   Not until 1875 was the right of workers to
combine in order to attain their ends conceded fully.   In
that year Parliament declared that workmen combining in
furtherance of a trade dispute should not be indictable for
criminal conspiracy unless the act if done by one person
would be indictable as a crime.[9]   After that statute a com-
bination of workmen to effect the ordinary objects of a
strike was no longer a criminal offense.   But picketing,
though peaceful, in aid of a strike, remained illegal;[10] and
likewise the boycott.[11]   Not until 1906 was the ban on

_____

[6] 5 Geo. 4, c. 95, (replaced by 6 Geo. 4, c. 129).   For the earlier
law see, for instance, 34 Edw. 3, c. 9; *The King* v. *Journeymen
Tailors of Cambridge*, 8 Modern, 10; Wright, The Law of Criminal
Conspiracies.

[7] Criminal Law Amendment Act (1871), 34 & 35 Vic., c. 32, § 1,
last paragraph.   For the earlier law see *Regina* v. *Rowlands*, 2 Den.
363.

[8] Criminal Law Amendment Act (1871), 34 & 35 Vic., c. 32, § 1,
sub-sec. 2.   For the earlier law see *Walsby* v. *Anley*, 3 E. & E. 516;
*Skinner* v. *Kitch*, 10 Cox C. C. 493; L. R. 2 Q. B. 393 (1867).

[9] The Conspiracy and Protection of Property Act (1875), 38 & 39
Vic., c. 86, § 3.   But see *Rigby* v. *Connol*, L. R. 14 Ch. D. 482, 491.

[10] 38 & 39 Vic., c. 86, § 7; *Regina* v. *Bauld*, 13 Cox C. C. 282;
*Lyons* v. *Wilkins*, [1896] 1 Ch. 811, 826, 831; [1899] 1 Ch. 255;
*Taff Vale Ry. Co.* v. *Amalgamated Society of Railway Servants*,
[1901] A. C. 426.

[11] *Temperton* v. *Russell* [1893] 1 Q. B. 715; *Quinn* v. *Leathem*,
[1901] A. C. 495.   But compare with these cases *Boots* v. *Grundy*,
82 L. T. R. 769; *Scottish Co-operative Society* v. *Glasgow Fleshers*,
35 Scottish L. R. 645; *Bulcock* v. *St. Anne's Master Builders' Federa-
tion*, 19 T. L. R. 27; a distinction between these and the two former
is pointed out in *Quinn* v. *Leathem*, *supra*, p. 539.   The Royal Com-

peaceful picketing and the bringing of pressure upon an employer by means of a secondary strike or a boycott removed.[12] In 1906, also, the act of inducing workers to break their contract of employment (previously held an actionable wrong)[13] was expressly declared legal.[14] In England improvement of the condition of workingmen

mission on Trade Disputes and Trade Combinations, whose recommendations were the basis of the Trade Disputes Act, 1906, 6 Edw. 7, c. 47, recommended, Report, p. 16, "that an act should be passed for the following objects:— . . . (2) To declare strikes from whatever motive or for whatever purposes (including sympathetic or secondary strikes), apart from crime or breach of contract, legal . . ." It is probable that §§ 1 and 3 of the Act of 1906 make the secondary strike or boycott in the course of a trade dispute legal. But see note 14, par. 2.

[12] The Trade Disputes Act (1906), 6 Edw. 7, c. 47, § 2.

[13] *Read* v. *Friendly Society of Stonemasons*, [1902] 2 K. B. 88; *id.*, 732; *South Wales Miners' Federation* v. *Glamorgan Coal Co.*, [1905] A. C. 239.

[14] 6 Edw. 7, c. 47, § 3, "An act done by a person in contemplation or furtherance of a trade dispute shall not be actionable on the ground only that it induces some other person to break a contract of employment or that it is an interference with the trade, business, or employment of some other person, or with the right of some other person to dispose of his capital or his labour as he wills." But the employee who breaks his contract remains personally liable in damages.

The law of England still prohibits certain practices which might prove effective in the struggle between employer and employee. Thus the Trade Disputes Act, *supra,* does not sanction some threats or coercion, *Conway* v. *Wade,* [1909] A. C. 506, 511. It does not permit a strike to force the discharge of a member of the union who has not paid a fine, *Conway* v. *Wade, supra.* Nor does it permit inducing an employer's men to break their contracts in order to force him to join an employers' association, since this is not a trade dispute within the meaning of the act, *Larkin* v. *Long,* [1915] A. C. 814. The judges are by no means agreed as to what constitutes coercion. Compare: *Hodges* v. *Webb,* [1920] 2 Ch. 70; *Valentine* v. *Hyde,* [1919] 2 Ch. 129; *Pratt* v. *British Medical Association,* [1919] 1 K. B. 244; and *Davies v. Thomas,* [1920] 1 Ch. 217.

and their emancipation appear to have been deemed recently the paramount public need.

In the British Dominions the rules governing the struggle between employer and employed were likewise subjected to many modifications; but the trend of social experiment took a direction very different from that followed in the mother country. Instead of enabling the worker to pursue such methods as he might deem effective in the contest, statutes were enacted in some of the Dominions which forbade the boycott, peaceful picketing, and even the simple strike and the lockout;[15] use of the injunction to enforce compliance with these prohibitions was expressly santioned;[16] and violation of the statute

[15]Australia: Commonwealth Conciliation and Arbitration Act, 1904–15, §§ 6–9; New South Wales, Industrial Arbitration Act, 1912–1918, §§ 48D and 48E; compare Queensland, Industrial Arbitration Act, 1916, § 65. New Zealand: Industrial Conciliation and Arbitration Act, 1908, § 108; Industrial Conciliation and Arbitration Amendment Act, 1908, Part I.

[16] The Industrial Disputes Act of New South Wales, 1908, § 60, made strikes and lockouts illegal and the Industrial Arbitration Act, 1912, which replaced it, continued their outlawry, §§ 44–48, and expressly provided that they might be enjoined by the Court of Industrial Arbitration; but by the Act of 1918, § 15, §§ 45 to 48 inclusive of the earlier act, dealing with strikes, were amended:

" 45. The following strikes and no others shall be illegal:—

"(a) Any strike by employees of the crown, etc.

"(b) Any strike by the employees in an industry the conditions of which are for the time being wholly or partially regulated by an award or by an industrial agreement: etc.

"(c) Any strike which has been commenced prior to the expiry of fourteen clear days notice in writing of intention to commence the same or of the existence of such conditions as would be likely to lead to the same given the Minister, etc.

" 46. In the event of an illegal strike occurring in any industry, the court may order any trade union, whose executive or members are taking part in or aiding or abetting the strike, to pay a penalty not exceeding five hundred pounds."

The Commonwealth Conciliation and Arbitration Act, 1904, § 38(e), provides that the Court of Arbitration and Conciliation

was also made punishable by criminal proceedings.[17]
These prohibitions were the concomitants of prescribed
industrial arbitration through administrative tribunals by
which the right of both employer and employee to liberty
and property were seriously abridged in the public inter-
est. Australia [18] and New Zealand [19] made compulsory both
arbitration and compliance with the award.[20] Canada lim-
ited the compulsion to a postponement of the right to
strike until the dispute should have been officially investi-
gated and reported upon.[21] In these Dominions the un-
interrupted pursuit of industry and the prevention of the
arbitrary use of power appear to be deemed the para-
mount public needs.

. In the United States the rules of the common law gov-
erning the struggle between employer and employee have
likewise been subjected to modifications. These have

---

shall have power " to enjoin any organization or person from com-
mitting or continuing any contravention of this Act."

[17] See note .15, *supra.*

[18] The Commonwealth Conciliation and Arbitration Act, 1904–1915,
§§ 19–31. (Printed as Appendix A to Commonwealth Acts 1914–
1915.) See Henry B. Higgins, "A New Province for Law and Order,"
29 Harv. Law Rev. 13; 32 Harv. Law Rev. 189; 34 Harv. Law Rev.
105.

[19] Industrial Conciliation and Arbitration Act, 1908, *supra,* §§ 53–
104, as amended by Acts 1908, No. 239, Part II; Acts 1911, No. 33;
Acts 1913, No. 7.

[20] Compare Kansas act creating a court of industrial relations, Laws
1920, c. 29. *State v. Howat,* 107 Kan. 423; *State v. Howat,* 109 Kan.
376; *Court of Industrial Relations v. Charles Wolff Packing Co.,*
109 Kan. 629.

[21] Industrial Disputes Investigation Act, 1907, 6–7 Edw. 7, c. 20,
§§ 56, 57. *Rex v. McGuire,* 16 O. L. R. 522. 9–10 Edw. 7, c. 29.
8–9 Geo. 5, c. 27. 10–11 Geo. 5, c. 29.

Picketing is illegal. Criminal Code, Canada, § 501; *Krug Furni-
ture Co. v. Union of Woodworkers,* 5 O. L. R. 463; *Cotter v. Os-
borne,* 18 Man. 471; *Vulcan Iron Works v. Winnipeg Lodge,* 21 Man.
473; *Le Roi Mining Co. v. Rossland Miners Union,* 8 B. C. 370. But
see Rev. Stats., B. C., c. 228.

been made mainly through judicial decisions. The legal right of workingmen to combine and to strike in order to secure for themselves higher wages, shorter hours and better working conditions received early general recognition.[22] But there developed great diversity of opinion as to the means by which,[23] and also as to the persons through whom,[24] and upon whom [25] pressure might permissibly be ·

[22] *Commonwealth* v. *Hunt*, 4 Met. 111; for earlier common law and statutory provisions see *Carew* v. *Rutherford*, 106 Mass. 1, 14; 1 Weeden, Economic and Social History of New England, pp. 173, 334. Freund, Police Power, § 331; Commons, History of Labor in the United States, vol. 1, c. 5.

[23] For the boycott see note 28, *infra*, p. 364; and for peaceful picketing, note 29, *infra*, p. 365.

In some jurisdictions the strike was considered an unlawful means of procuring the unionization of the shop,—see *Plant* v. *Woods*, 176 Mass. 492; *Pickett* v. *Walsh*, 192 Mass. 572, 585; *Lucke* v. *Clothing Cutters' Assembly*, 77 Md. 396; *Erdman* v. *Mitchell*, 207 Pa. St. 79; Freund, Police Power, § 331;—while in others it was regarded as permissible,—*National Protective Association* v. *Cumming*, 170 N. Y. 315; *Kemp* v. *Division No. 241*, 255 Ill. 213; *Grant Construction Co.* v. *St. Paul Building Trades Council*, 136 Minn. 167; *State* v. *Van Pelt*, 136 N. Car. 633; *Jetton-Dekle Lumber Co.* v. *Mather*, 53 Fla. 969; *Cohn & Roth Electric Co.* v. *Bricklayers Union*, 92 Conn. 161.

[24] In some jurisdictions the officers of the national union, not being employees, are regarded as outsiders with no justification for their acts,—*Booth* v. *Burgess*, 72 N. J. Eq. 181; *Jonas Glass Co.* v. *Glass Bottle Blowers' Association*, 72 N. J. Eq. 653; 77 N. J. Eq. 219. In other jurisdictions it is held that they are furthering a legitimate interest,—see *Allen* v. *Flood*, [1898] A. C. 1; *Jose* v. *Metallic Roofing Co.*, [1908] A. C. 514, reversing 14 O. L. R. 156; *Gill Engraving Co.* v. *Doerr*, 214 Fed. 111; *Lindsay & Co.* v. *Montana Federation of Labor*, 37 Mont. 264. See *American Steel Foundries* v. *Tri-City Central Trades Council*, ante, 184.

[25] In some jurisdictions the courts seek to localize the conflict by making it illegal to bring in any party beyond those between whom the original dispute arose,—*Burnham* v. *Dowd*, 217 Mass. 351; *Booth* v. *Burgess*, 72 N. J. Eq. 181; *Purvis* v. *United Brotherhood*, 214 Pa. St. 348;—in other jurisdictions it is considered that anyone having business relations with either party which bear on the matter in con-

exerted in order to induce the employer to yield to the demands of the workingmen. Courts were required, in the absence of legislation, to determine what the public welfare demanded;—whether it would not be best subserved by leaving the contestants free to resort to any means not involving a breach of the peace or injury to tangible property; whether it was consistent with the public interest that the contestants should be permitted to invoke the aid of others not directly interested in the matter in controversy; and to what extent incidental injury to persons not parties to the controversy should be held justifiable.

The earliest reported American decision on peaceful picketing appears to have been rendered in 1888 [26]; the earliest on boycotting in 1886.[27] By no great majority the prevailing judicial opinion in America declares the boy-

---

troversy has violated his neutrality and is subject to reprisal from the union which is carrying on the struggle,—*Bossert* v. *Dhuy*, 221 N. Y. 342; *Master Builders' Association* v. *Domascio*, 16 Colo. App. 25; *Pierce* v. *Stablemen's Union*, 156 Cal. 70, 76; *Cohn & Roth Electric Co.* v. *Bricklayers Union*, 92 Conn. 161; *Gill Engraving Co.* v. *Doerr*, 214 Fed. 111; *Grant Construction Co.* v. *St. Paul Building Trades Council*, 136 Minn. 167. See 31 Harv. Law Rev. 482, and *Auburn Draying Co.* v. *Wardell*, 227 N. Y. 1, for limitations.

Again, in some States it is unlawful to resort to the method of notifying persons that a strike will occur if a non-union employer or his product is employed,—*Booth* v. *Burgess*, 72 N. J. Eq. 181; *Gray* v. *Building Trades Council*, 91 Minn. 171;—while in other States it is lawful,—*Cohn & Roth Electric Co.* v. *Bricklayers Union*, 92 Conn. 161, 167; *Bossert* v. *Dhuy*, 221 N. Y. 342.

[26] *Sherry* v. *Perkins*, 147 Mass. 212; but the doctrine was not established until eight years later, *Vegelahn* v. *Guntner*, 167 Mass. 92.

[27] The earliest reported cases seem to be *People* v. *Wilzig*, 4 N. Y. Crim. 403; and *People* v. *Kostka*, 4 N. Y. Crim. 429, both of which occurred in June, 1886; the leading case of *State* v. *Glidden*, 55 Conn. 46, came the next year. Laidler, however, speaks of an unreported case in 1840; see Laidler, Boycotts and the Labor Struggle, p. 70; see also Commons, History of Labor in the United States, vol. 2, pp. 267, 317, 364.

cott as commonly practiced an illegal means [28] (see *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443), while it in-

[28] Some of the difference of opinion results from a difference in definition. A boycott is sometimes defined so as to entail violence or malicious oppression, *State* v. *Glidden,* 55 Conn. 46; while in other cases it is simply pressure exerted by abstention from business relations, *Mills* v. *United States Printing Co.,* 99 App. Div. 605, affd. 199 N. Y. 76. The terms primary and secondary as describing the boycott are also of uncertain content. Only a boycott that is free of violence or malevolence is anywhere held to be lawful. This peaceful boycott in support of a *bona fide* industrial conflict, however, is not everywhere held lawful, and its lawfulness often is held to depend on whether it is used against the industrial antagonist directly (primary boycott) or against an outsider because of his influence on or connection with the industrial antagonist (secondary boycott). Holding the boycott, primary and secondary, illegal: *Wilson* v. *Hey,* 232 Ill. 389; *Beck* v. *Railway Teamsters' Union,* 118 Mich. 497; *Gray* v. *Building Trades Council,* 91 Minn. 171; *Booth* v. *Burgess,* 72 N. J. Eq. 181; *Purvis* v. *United Brotherhood,* 214 Pa. St. 348; *Patch Manufacturing Co.* v. *Protection Lodge,* 77 Vt. 294; *State* v. *Glidden,* 55 Conn. 46; *Crump* v. *Commonwealth,* 84 Va. 927, 939; *Jensen* v. *Cooks', etc. Union,* 39 Wash. 531; *Webb* v. *Cooks', etc. Union,* 205 S. W. (Tex.) 465; *Seubert* v. *Reiff,* 164 N. Y. S. 522; *American Federation of Labor* v. *Buck's Stove & Range Co.,* 33 App. D. C. 83; *Burnham* v. *Dowd,* 217 Mass. 351; *My Maryland Lodge* v. *Adt,* 100 Md. 238.

Holding primary boycott legal: *Foster* v. *Retail Clerks' Association,* 78 N. Y. S. 860, 867; *Butterick Publishing Co.* v. *Typographical Union,* 100 N. Y. S. 292; *Gill Engraving Co.* v. *Doerr,* 214 Fed. 111; *Empire Theatre Co.* v. *Cloke,* 53 Mont. 183; *Steffes* v. *Motion Picture Union,* 136 Minn. 200; *Stoner* v. *Robert,* 43 Wash. (D. C.) L. Rep. 437; *Guethler* v. *Altman,* 26 Ind. App. 587; *Pierce* v. *Stablemen's Union,* 156 Cal. 70; *Riggs* v. *Cincinnati Waiters,* 5 Ohio Nisi Prius, 386; *McCormick* v. *Local Union,* 13 Ohio Cir. Ct. (N. S.) 545; *Ex parte Sweitzer,* 13 Okl. Cr. 154. See Laws of Utah, 1917, c. 68; *Root* v. *Anderson,* 207 S. W. (Mo.) 255.

Holding secondary boycott legal: *Bossert* v. *Dhuy,* 221 N. Y. 342—though compare *Auburn Draying Co.* v. *Wardell,* 227 N. Y. 1; *Stoner* v. *Robert,* 43 Wash. (D. C.) L. Rep. 437; *Lindsay & Co.* v. *Montana Federation of Labor,* 37 Mont. 264; *Pierce* v. *Stablemen's Union,* 156 Cal. 70, 76; *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581; see *Marx & Haas Jeans Clothing Co.* v. *Watson,* 168 Mo. 133.

clines towards the legality of peaceful picketing.[29]  See
*American Steel Foundries* v. *Tri-City Central Trades
Council, ante,* 184.   But in some of the States, notably
New York, both peaceful picketing and the boycott are
declared permissible.[30]  Judges, being thus called upon to
exercise a quasi-legislative function and weigh relative
social values, naturally differed in their conclusions on
such questions.[31]

[29] Holding picketing in itself illegal:—*Vegelahn* v. *Guntner,* 167
Mass. 92; *Pierce* v. *Stablemen's Union,* 156 Cal. 70; *Barnes & Co.* v.
*Chicago Typographical Union,* 232 Ill. 424; *Lyon & Healy* v. *Piano,
etc. Workers' Union,* 289 Ill. 176; *Beck* v. *Railway Teamsters' Union,*
118 Mich. 497; *Clarage* v. *Luphringer,* 202 Mich. 612; *Baldwin Lum-
ber Co.* v. *Brotherhood of Teamsters, etc.,* 91 N. J. Eq. 240; *Baasch*
v. *Cooks Union,* 99 Wash. 378; *Webb* v. *Cooks', etc., Union,* 205
S. W. (Tex.) 465; the Washington Act, 1915, c. 181, declaring picket-
ing to be unlawful, was defeated on referendum in 1916; *Atchison,
Topeka & Santa Fe Ry. Co.* v. *Gee,* 139 Fed. 582.

Stating that peaceful picketing is lawful:—*Riggs* v. *Cincinnati
Waiters,* 5 Ohio Nisi Prius, 386; *McCormick* v. *Local Union,* 13 Ohio
Cir. Ct. (N. S.) 545; *Jones* v. *Van Winkle Machine Works,* 131 Ga.
336, 340; *Karges Furniture Co.* v. *Amalgamated, etc., Union,* 165 Ind.
421, 430, 431; *Everett Waddey Co.* v. *Richmond Typographical
Union,* 105 Va. 188, 197; *Steffes* v. *Motion Picture Union,* 136 Minn.
200,—see also Laws 1917, c. 493; *Stoner* v. *Robert,* 43 Wash. (D. C.)
L. Rep. 437; *Empire Theatre Co.* v. *Cloke,* 53 Mont. 183; *Mills* v.
*United States Printing Co.,* 99 App. Div. 605, affd. 199 N. Y. 76;
*Ex parte Sweitzer,* 13 Okl. Cr. 154; *White Mountain Freezer Co.* v.
*Murphy,* 78 N. H. 398; see Utah, Laws of 1917, c. 68; *American
Engineering Co.* v. *International Moulders Union,* 25 Pa. Dist. 564;
*Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45; *St. Louis* v.
*Gloner,* 210 Mo. 502.

[30] *Mills* v. *United States Printing Co.,* 99 App. Div. 605, affd. 199
N. Y. 76; see also cases in note 29, *supra,* from Ohio, Minnesota,
Montana, and Oklahoma.

[31] Compare:—*Plant* v. *Woods,* 176 Mass. 492, 502, last paragraph,
with *Cohn & Roth Electric Co.* v. *Bricklayers Union,* 92 Conn. 161,
167, and, *Bossert* v. *Dhuy,* 221 N. Y. 342, 359. See Geldart, The
Present Law of Trade Unions and Trade Disputes, p. 24; Hoxie,
Trade Unionism in the United States, p. 231; "Strikes and Boy-
cotts", 34 Harv. Law Rev. 880.

In England, observance of the rules of the contest has been enforced by the courts almost wholly through the criminal law or through actions at law for compensation. An injunction was granted in a labor dispute as early as 1868.[32]   But in England resort to the injunction has not been frequent and it has played no appreciable part there in the conflict between capital and labor.   In America the injunction did not secure recognition as a possible remedy until 1888.[33]   When a few years later its use became extensive and conspicuous, the controversy over the remedy overshadowed in bitterness the question of the relative substantive rights of the parties.   In the storms of protest against this use many thoughtful lawyers joined.[34] The equitable remedy, although applied in accordance with established practice, involved incidents which, it was asserted, endangered the personal liberty of wage-earners. The acts enjoined were frequently, perhaps usually, acts which were already crimes at common law or had been made so by statutes.   The issues in litigation arising out of trade disputes related largely to questions of fact.   But in equity issues of fact as of law were tried by a single judge, sitting without a jury.   Charges of violating an

[32] *Springhead Spinning Co.* v. *Riley*, L. R. 6 Eq. 551.

[33] The earliest case of importance was *Sherry* v. *Perkins*, 147 Mass. 212 (1888).   But injunctions were granted four or five years earlier. Commons, History of Labor in the United States, vol. 2, p. 504.

[34] " Government by Injunction " by W. H. Dunbar, 13 Law Quarterly Review, 347; " Government by Injunction ", by Charles Noble Gregory, 11 Harv. Law Rev. 487; " Injunction and Organized Labor ", by Charles C. Allen, 28 Am. Law Rev. 828; " The Modern Use of Injunctions ", by F. J. Stimson, 10 Pol. Sci. Quarterly, 189; " Strikes and Courts of Equity ", by William Draper Lewis, 46 Am. Law Reg. 1; " Government by Injunction ", by Percy L. Edwards, 57 Albany Law Journal, 8; " The Abuses of Injunction ", by Samuel Seabury, 29 Arena, 561; " Government by Injunction ", by Cornelius H. Fauntleroy, 69 Cent. Law Journal, 129; " Government by Injunction ", by Thomas F. Hargis, 4 Amer. Fed. 227.   See Report of U. S. Industrial Commission (1901) vol. XVII, p. 611.

injunction were often heard on affidavits merely, without the opportunity of confronting or cross-examining witnesses.[35] Men found guilty of contempt were committed in the judge's discretion, without either a statutory limit upon the length of the imprisonment, or the opportunity of effective review on appeal, or the right to release on bail pending possible revisory proceedings.[36] The effect of the proceeding upon the individual was substantially the same as if he had been successfully prosecuted for a crime; but he was denied, in the course of the equity proceedings, those rights which by the Constitution are commonly secured to persons charged with a crime.

It was asserted that in these proceedings an alleged danger to property, always incidental and at times insignificant, was often laid hold of to enable the penalties of the criminal law to be enforced expeditiously without that protection to the liberty of the individual which the Bill of Rights was designed to afford; that through such proceedings a single judge often usurped the functions not only of the jury but of the police department; that, in prescribing the conditions under which strikes were per-

---

[35] In *Long* v. *Bricklayers, etc. Union,* 17 Pa. Dist. 984, the judge prefaced his opinion as follows, " Hardly anything of greater private or public gravity is ever presented to the court, and yet these matters are constantly receiving adjudication without a single witness brought before the judge. It is a bad practice. I confess my inability to determine with any satisfaction from an inspection of inanimate manuscript, questions of veracity. In disposing of the present rule, I am compelled to find, as best I may from perusing two hundred and thirty-five lifeless typewritten pages of conflicting evidence, the facts which must determine respondent's guilt or innocence on the quasi-criminal charge of contempt."

[36] *Hake* v. *People,* 230 Ill. 174, 196, discretion of judge; *Tinsley* v. *Anderson,* 171 U. S. 101, 107–108, unlimited commitment; *State* v. *Erickson,* 66 Wash. 639, 641; *State v. Chouteau County Court,* 51 Mont. 337, 342; *Scoric* v. *United States,* 217 Fed. 871, scope of review; *People* v. *Tefft,* 3 Cow. (N. Y.) 340, *Matter of Vanderbilt,* 4 Johns. Ch. (N. Y.) 57, admission to bail within discretion of judge.

missible and how they might be carried out, he usurped also the powers of the legislature; and that incidentally he abridged the constitutional rights of individuals to free speech, to a free press and to peaceful assembly.

It was urged that the real motive in seeking the injunction was not ordinarily to prevent property from being injured nor to protect the owner in its use, but to endow property with active, militant power which would make it dominant over men. In other words, that, under the guise of protecting property rights, the employer was seeking sovereign power. And many disinterested men, solicitous only for the public welfare, believed that the law of property was not appropriate for dealing with the forces beneath social unrest; that in this vast struggle it was unwise to throw the power of the State on one side or the other according to principles deduced from that law; that the problem of the control and conduct of industry demanded a solution of its own; and that, pending the ascertainment of new principles to govern industry, it was wiser for the State not to interfere in industrial struggles by the issuance of an injunction.[37]

After the constitutionality and the propriety of the use of the injunction in labor disputes was established judicially, those who opposed the practice sought the aid of Congress and of state legislatures. The bills introduced varied in character and in scope. Many dealt merely with rights; and, of these, some declared, in effect, that no act done in furtherance of a labor dispute by a combination of workingmen should be held illegal, unless it would

[37] See Final Report of the (U. S.) Industrial Commission (1902); Final Report of the (U. S.) Commission on Industrial Relations (1915), (Sen. Doc. 415, 64th Cong., 1st sess.), vol. 1, pp. 52–53, 90–92, vol. 11, testimony of Mr. Gilbert E. Roe, p. 10477; testimony of Mr. Arthur Woods, p. 10550; testimony of Dr. Frank Goodnow, p. 10599. American Federationist, vol. 7, p. 350; vol. 9, p. 685; vol. 15, p. 976.

have been so if done by a single individual; while others purported to legalize specific practices, like boycotting or picketing. Other bills dealt merely with the remedy; and of these, some undertook practically to abolish the use of the injunction in labor disputes, while some merely limited its use either by prohibiting its issue under certain conditions or by denying power to restrain certain acts. Some bills undertook to modify both rights and remedies.[38] These legislative proposals occupied the attention of Congress during every session but one in the twenty years between 1894 and 1914.[39] Reports recommending such legis-

[38] 53rd Congress: S. 1563, S. 1898, S. 2253, H. R. 7362, H. R. 7363; 54th Congress: S. 237, S. 1750, S. 2984, H. R. 319; 56th Congress: S. 4233, H. R. 8917; 57th Congress: S. 1118, S. 4553, H. R. 9678, H. R. 11060; 58th Congress: H. R. 89, H. R. 1234, H. R. 4063, H. R. 6782, H. R. 8136, H. R. 18327; 59th Congress: S. 2829, H. R. 4445, H. R. 9328, H. R. 17976, H. R. 18171, H. R. 18446, H. R. 18752; 60th Congress: S. 4533, S. 4727, S. 5888, H. R. 69, H. R. 94, H. R. 17137, H. R. 21358, H. R. 21359, H. R. 21454, H. R. 21489, H. R. 21539, H. R. 21629, H. R. 21991, H. R. 22010, H. R. 22032, H. R. 22298, H. R. 26300, H. R. 24781, H. R. 36609; 61st Congress: S. 3291, S. 4481, H. R. 3058, H. R. 9766, H. R. 10890, H. R. 16026, H. R. 18410, H. R. 20486, H. R. 20680, H. R. 20827, H. R. 21334, H. R. 22566; 62nd Congress: S. 6266, H. R. 4015, H. R. 4651, H. R. 5328, H. R. 5606, H. R. 9435, H. R. 11032, H. R. 23189, H. R. 21486, H. R. 21595, H. R. 22208, H. R. 22349, H. R. 22354, H. R. 22355, H. R. 23635; 63rd Congress: S. 927, H. R. 1873, H. R. 4659, H. R. 5484, H. R. 15657—which became the Clayton Act.

[39] See note 38, *supra.* Also 53rd Congress: resolutions to investigate the use of the injunction in certain cases, 26 Cong. Rec. 2466; 56th Congress: debate, 34 Cong. Rec. 2589; 60th Congress: hearings, Sen. Doc. 525; special message of the President, Sen. Doc. 213, 42 Cong. Rec. 1347; papers relating to injunctions in labor cases, Sen. Docs. 504 and 524; 61st Congress: debate, 45 Cong. Rec. 343; 62nd Congress: debate, 48 Cong. Rec. 6415–6470; hearings, Sen. Doc. 944; petitions, Sen. Doc. 440; hearings before the House Committee on the Judiciary, Jan. 11, 17–19, February 8, 14, 1912; hearings before a subcommittee of Senate Committee on the Judiciary, 62nd Congress, 2nd sess.; 63rd Congress, see debates on H. R. 15657 (the Clayton Act).

lation were repeatedly made by the Judiciary Committee of the House or that of the Senate; and at some sessions by both.[40] Prior to 1914, legislation of this character had at several sessions passed the House;[41] and in that year Congress passed and the President approved the Clayton Act, § 20 of which is substantially the same as Paragraph 1464 of the Arizona Civil Code. Act of October 15, 1914, c. 323, 38 Stat. 730, 738.

Such was the diversity of view concerning peaceful picketing and the boycott expressed in judicial decisions and legislation in English-speaking countries when in 1913 the new State of Arizona, in establishing its judicial system, limited the use of the injunction and when in 1918 its Supreme Court was called upon to declare for the first time the law of Arizona on these subjects. The case of *Truax* v. *Bisbee Local No. 380,* 19 Ariz. 379, presented facts identical with those of the case at bar.[42] In that case the Supreme Court made its decision on four controverted points of law. In the first place, it held that the officials of the union were not outsiders with no justification for their acts (19 Ariz. 379, 390).[43] In the second place, rejecting the view held by the federal courts and the majority of the state courts on the illegality of the boycott, it

---

[40] 54th Congress, House Report No. 2471; 56th Congress, House Report No. 1987, 2007; 57th Congress, Senate Report No. 1650, House Report No. 1522; 62nd Congress, House Report No. 612; 63rd Congress, Senate Report No. 698, House Report No. 627, Conference Report, Senate Document 585.

[41] In the 57th Congress, H. R. 11060 passed the House, 35 Cong. Rec. 4995. In the 62nd Congress, H. R. 23635 passed the House, 48 Cong. Rec. 6470, 6471.

[42] In this case the Supreme Court of Arizona said: " This action is founded upon the identical facts upon which the case of *Truax* v. *Bisbee Local No. 380,* 19 Ariz. 379, was founded . . . The questions presented in this record were necessarily decided by this court in the former hearing of the matter." *Truax* v. *Corrigan,* 20 Ariz. 7, 8.

[43] See note 24, p. 362, *supra.*

specifically accepted the law of New York, Montana and California, citing the decisions of those States (19 Ariz. 379, 388, 390).[44]  In the third place, it rejected the law of New Jersey, Minnesota and Pennsylvania that it is illegal to circularize an employer's customers, and again adopted the rule declared in the decisions of the courts of New York, Montana, California and Connecticut (19 Ariz. 379, 389).[45]  In deciding these three points the Supreme Court of Arizona made a choice between well-established precedents laid down on either side by some of the strongest courts in the country.  Can this court say that thereby it deprived the plaintiff of his property without due process of law?

The fourth question requiring decision was whether peaceful picketing should be deemed legal.  Here, too, each of the opposing views had the support of decisions of strong courts.[46]  If the Arizona court had decided that by the common law of the State the defendants might peacefully picket the plaintiffs, its decision, like those of the courts of Ohio, Minnesota, Montana, New York, Oklahoma and New Hampshire, would surely not have been open to objection under the Federal Constitution; for this court has recently held that peaceful picketing is not unlawful.  *American Steel Foundries* v. *Tri-City Central Trades Council, supra.*  The Supreme Court of Arizona found it unnecessary to determine what was the common law of the State on that subject, because it construed Paragraph 1464 of the Civil Code as declaring peaceful picketing to be legal.  In the case at bar, commenting on the earlier case, the court said: " The statute adopts the view of a number of courts which have held ' picketing,'

---

[44] See note 28, p. 364, *supra.*

[45] See note 25, p. 362, *supra,* 2nd paragraph; also *Lindsay & Co.* v. *Montana Federation of Labor,* 37 Mont. 264; *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581.

[46] See note 29, p. 365, *supra.*

if peaceably carried on for a lawful purpose, to be no violation of any legal right of the party whose place of business is ' picketed,' and whether as a fact the picketing is carried on by peaceful means, as against the other view, taken by the federal courts and many of the state courts, that picketing is *per se* unlawful." Shortly before that decision the Criminal Court of Appeals of Oklahoma had placed a similar construction upon a statute of that State, declaring that " the doctrine [that picketing is not *per se* unlawful] represents the trend of legal thought of modern times, and is specifically reflected in the statute above construed." *Ex parte Sweitzer*, 13 Okl. Cr. 154, 160. See *St. Louis* v. *Gloner*, 210 Mo. 502. A State, which despite the Fourteenth Amendment possesses the power to impose on employers without fault unlimited liability for injuries suffered by employees,[47] and to limit the freedom of contract of some employers and not of others,[48] surely does not lack the power to select for its citizens that one of conflicting views on boycott by peaceful picketing which its legislature and highest court consider will best meet its conditions and secure the public welfare.

The Supreme Court of Arizona, having held as a rule of substantive law that the boycott as here practiced was legal at common law; and that the picketing was peaceful and, hence, legal under the statute (whether or not it was legal at common law), necessarily denied the injunction, since, in its opinion, the defendants had committed no legal wrong and were threatening none. But even if this court should hold that an employer has a constitutional right to be free from interference by such a boycott or that the picketing practiced was not in fact peaceful, it does not follow that Arizona would lack the power to refuse to protect that right by injunction. For it is clear that the refusal of an equitable remedy for a tort is not

---

[47] *Arizona Employers' Liability Cases*, 250 U. S. 400.
[48] *Dominion Hotel* v. *Arizona*, 249 U. S. 265.

necessarily a denial of due process of law. And it seems to be equally clear that such refusal is not necessarily arbitrary and unreasonable when applied to incidents of the relation of employer and employee. The considerations which show that the refusal is not arbitrary or unreasonable show likewise that such refusal does not necessarily constitute a denial of equal protection of the laws merely because some, or even the same, property rights which are excluded by this statute from protection by injunction, receive such protection under other circumstances, or between persons standing in different relations. The acknowledged legislative discretion exerted in classification, so frequently applied in defining rights, extends equally to the grant of remedies.[49] It is for the legislature to say— within the broad limits of the discretion which it possesses—whether or not the remedy for a wrong shall be both criminal and civil and whether or not it shall be both at law and in equity.

A State is free since the adoption of the Fourteenth Amendment, as it was before, not only to determine what system of law shall prevail in it, but, also, by what processes legal rights may be asserted, and in what courts they may be enforced. *Missouri v. Lewis,* 101 U. S. 22, 31; *Iowa*

---

[49] In *Gooch* v. *Stephenson,* 1 Shepley (Me.) 371 (1836), the plaintiff attacked as unconstitutional a statute declaring that no action of trespass should be brought against an owner of cattle breaking through an insufficient fence. The court, *inter alia,* said:

"It has been insisted that justice and the security of rights is best promoted by maintaining the remedy as it before existed; but that is an argument which addresses itself to the legislative power, and not to the judicial. . . . It was for the legislature to determine what protection should be thrown around this species of property; . . . and where he [the owner] might invoke the aid of courts of justice. They have no power to take away vested rights; but they may regulate their enjoyment."

In this case the public importance of good fences was held to justify the denial of an existing remedy for injuries to property or a curtailment of the right.

*Central Ry. Co.* v. *Iowa,* 160 U. S. 389.   As a State may adopt or reject trial by jury, *Walker* v. *Sauvinet,* 92 U. S. 90; or adopting it may retain or discard its customary incidents, *Hayes* v. *Missouri,* 120 U. S. 68; *Brown* v. *New Jersey,* 175 U. S. 172; *Maxwell* v. *Dow,* 176 U. S. 581; as a State may grant or withhold review of a decision by appeal, *Reetz* v. *Michigan,* 188 U. S. 505; so it may determine for itself, from time to time, whether the protection which it affords to property rights through its courts shall be given by means of the preventive remedy or exclusively by an action at law for compensation.

Nor is a State obliged to protect all property rights by injunction merely because it protects some, even if the attending circumstances are in some respects similar. The restraining power of equity might conceivably be applied to every intended violation of a legal right. On grounds of expediency its application is commonly denied in cases where there is a remedy at law which is deemed legally adequate. But an injunction has been denied on grounds of expediency in many cases where the remedy at law is confessedly not adequate. This occurs whenever a dominant public interest is deemed to require that the preventive remedy, otherwise available for the protection of private rights, be refused and the injured party left to such remedy as courts of law may afford. Thus, courts ordinarily refuse, perhaps in the interest of free speech, to restrain actionable libels. *Boston Diatite Co.* v. *Florence Manufacturing Co.,* 114 Mass. 69; *Prudential Assurance Co.* v. *Knott,* L. R. 10 Ch. App. 142. In the interest of personal liberty they ordinarily refuse to enforce specifically, by mandatory injunction or otherwise, obligations involving personal service. *Arthur* v. *Oakes,* 63 Fed. 310, 318; *Davis* v. *Foreman,* [1894] 3 Ch. 654, 657; *Gossard* v. *Crosby,* 132 Ia. 155, 163, 164. In the desire to preserve the separation of governmental powers they have declined to protect by injunction mere political rights, *Giles* v.

*Harris*, 189 U. S. 475; and have refused to interfere with
the operations of the police department. *Davis* v. *Ameri-
can Society for the Prevention of Cruelty to Animals,* 75
N. Y. 362; *Delaney* v. *Flood,* 183 N. Y. 323; compare
*Bisbee* v. *Arizona Insurance Agency,* 14 Ariz. 313. In-
stances are numerous where protection to property by way
of injunction has been refused solely on the ground that
serious public inconvenience would result from restrain-
ing the act complained of. Such, for example, was the
case where a neighboring land owner sought to restrain a
smelter from polluting the air, but that relief, if granted,
would have necessitated shutting down the plant and this
would have destroyed the business and impaired the
means of livelihood of a large community.[50] There are
also numerous instances where the circumstances would,
according to general equity practice, have justified the
issue of an injunction, but it was refused solely because
the right sought to be enforced was created by statute,
and the courts, applying a familiar rule, held that the rem-
edy provided by the statute was exclusive.[51]

Such limitations upon the use of the injunction for the
protection of private rights have ordinarily been imposed
in the interest of the public by the court acting in the ex-
ercise of its broad discretion. But, in some instances, the

---

[50] See *McCarthy* v. *Bunker Hill & Sullivan Mining Co.,* 164 Fed.
927; *Bliss* v. *Anaconda Copper Mining Co.,* 167 Fed. 342; 186 Fed
789; *Cameron Furnace Co.* v. *Pennsylvania Canal Co.,* 2 Pearson
(Pa.) 208; *Johnson* v. *United Railways Co.,* 227 Mo. 423, 450;
*Conger* v. *New York, W. S. & B. R. R. Co.,* 120 N. Y. 29; *Wilkins*
v. *Diven,* 106 Kan. 283; *Marconi Wireless Telegraph Co.* v. *Simon,*
227 Fed. 906; 231 Fed. 1021.

[51] *Dimmick* v. *Delaware, Lackawanna & Western R. R. Co.,* 180
Pa. St. 468; *Curran* v. *Delano,* 235 Pa. St. 478; *Janney* v. *Buell,* 55
Ala. 408; the mechanics' lien, for instance, is not protected by equi-
table remedies but only by statutory provisions, *Chandler* v. *Hanna,*
73 Ala. 390; *Walker* v. *Daimwood,* 80 Ala. 245; Phillips on Me-
chanics Liens, §§ 307, 308.

denial of the preventive remedy because of a public inter-
est deemed paramount, has been expressly commanded by
statute.   Thus, the courts of the United States have been
prohibited from staying proceedings in any court of a
State, Judicial Code, § 265; and also from enjoining the
illegal assessment and collection of taxes.   Revised Stat-
utes, § 3224; *Snyder* v. *Marks,* 109 U. S. 189; *Dodge* v.
*Osborn,* 240 U. S. 118.   What Congress can do in curtail-
ing the equity power of the federal courts, state legisla-
tures may do in curtailing equity powers of the state
courts; unless prevented by the constitution of the State.
In other words States are free since the adoption of the
Fourteenth Amendment as they were before, either to
expand or to contract their equity jurisdiction.   The de-
nial of the more adequate equitable remedy for private
wrongs is in essence an exercise of the police power, by
which, in the interest of the public and in order to pre-
serve the liberty and the property of the great majority of
the citizens of a State, rights of property and the liberty
of the individual must be remoulded, from time to time,
to meet the changing needs of society.

   For these reasons, as well as for others stated by Mr.
Justice Holmes and Mr. Justice Pitney, [*ante,* 342, 344,]
in which I concur, the judgment of the Supreme Court of
Arizona should, in my opinion, be affirmed:—first, be-
cause in permitting damage to be inflicted by means of
boycott and peaceful picketing Arizona did not deprive the
plaintiffs of property without due process of law or deny
them equal protection of the laws; and secondly, because,
if Arizona was constitutionally prohibited from adopting
this rule of substantive law, it was still free to restrict the
extraordinary remedies of equity where it considered their
exercise to be detrimental to the public welfare, since
such restriction was not a denial to the employer either of
due process of law or of equal protection of the laws.